**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

Nos. 12-1232, 12-1233, 12-1250, 12-1276, 12-1279, 12-1280, 12-1285, 12-1292, 12-1293, 12-1296, 12-1299, 12-1300, 12-1304, 12-1448, and 12-1478
(Consolidated)

In the

# United States Court of Appeals
## for the District of Columbia Circuit

◆

**SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, et al.,**
*Petitioners,*

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION,**
*Respondent.*

◆

On Petition for Review from the Federal Energy Regulatory Commission
FERC-RM10-23-000 (July 21, 2011), FERC-RM10-23-001 (May 17, 2012), &
FERC-RM10-23-002 (Oct. 18, 2012)

◆

**JOINT INITIAL BRIEF OF PETITIONERS/INTERVENORS
CONCERNING STATEMENT OF THE CASE,
STATEMENT OF FACTS, AND STANDARDS OF REVIEW**

Attorneys for Petitioners/Intervenors:

Harvey L. Reiter
Email: hreiter@stinson.com
Jonathan D. Schneider
Email: jschneider@stinson.com
Jonathan Peter Trotta
Email: jtrotta@stinson.com
STINSON MORRISON HECKER LLP
1775 Pennsylvania Avenue, NW, Ste 800
Washington, DC  20006
Telephone: (202) 785-9100

Andrew W. Tunnell
Email: atunnell@balch.com
Ed R. Haden
Email: ehaden@balch.com
Scott B. Grover
Email: sgrover@balch.com
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 251-8100

*Counsel for Petitioners/Intervenors South Carolina Public Service Authority, the Large Public Power Council, and Sacramento Municipal Utility District*

*Counsel for Petitioner/Intervenor Southern Company Services, Inc.*

**Initial Brief:  May 28, 2013**

*Additional Parties and Counsel are Listed in the Overleaf*

George Scott Morris
Email: scott.morris@psc.alabama.gov
Luther Daniel Bentley, IV
Email: luke.bentley@psc.alabama.gov
ALABAMA PUBLIC SERVICE COMMISSION
Suite 836
100 North Union Street
Montgomery, AL 36104
Telephone: (334) 242-5200

*Counsel for Petitioner/Intervenor
Alabama Public Service Commission*


Sue Deliane Sheridan
Email: suedsheridan@yahoo.com
SHERIDAN ENERGY & ENVIRONMENTAL
  CONSULTING, LLC
1050 Thomas Jefferson Street, NW
Suite 700
Washington, DC 20007
Telephone: (202) 298-3718

*Counsel for Petitioner/Intervenor
Coalition for Fair Transmission Policy*


Randolph Lee Elliott
Email: relliott@mbolaw.com
MILLER, BALIS & O'NEIL, PC
1015 15th Street, NW
12th Floor
Washington, DC 20005-2605
Telephone: (202) 296-2960

*Counsel for Petitioners/Intervenors
American Public Power Association and
National Rural Electric Cooperative
Association*


Stephen Matthew Spina
Email: sspina@morganlewis.com
John D. McGrane
Email: jmcgrane@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Telephone: (202) 739-3000

Edward Comer, Vice President, General
Counsel and Corporate Secretary
Email: ecomer@eei.org
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 508-5000

*Counsel for Petitioner/Intervenor
Edison Electric Institute*

Wendy N. Reed
Email: reed@wrightlaw.com
Matthew J. Binette
Email: binette@wrightlaw.com
David S. Berman
Email: berman@wrightlaw.com
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3802
Telephone: (202) 393-1200

*Counsel for Petitioner/Intervenor
Midwest ISO Transmission Owners*

Howard Haswell Shafferman
Email: hhs@ballardspahr.com
Jack Nadim Semrani
Email: semranij@ballardspahr.com
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006-1157
Telephone: (202) 661-2200

*Counsel for Petitioner New York
Independent System Operator, Inc.*

Elias G. Farrah
Email: EFarrah@winston.com
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Telephone: (202) 282-5503

*Counsel for Intervenor
New York Transmission Owners*

Kenneth G. Jaffe
Email: kenneth.jaffe@alston.com
Michael E. Ward
Email: michael.ward@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004-1404
Telephone: (202) 756-3300

Randall Bruce Palmer, Esquire, Senior
Counsel
Email: rpalmer@firstenergycorp.com
ALLEGHENY ENERGY, INC.
800 Cabin Hill Drive
Greensburg, PA 15601-0000
Telephone: (724) 838-6894

*Counsel for Petitioners/Intervenors
American Transmission Systems
Incorporated, Cleveland Electric
Illuminating Company, FirstEnergy
Solutions Corp., Jersey Central Power
& Light Company, Metropolitan Edison
Company, Monongahela Power
Company, Ohio Edison Company,
Pennsylvania Electric Company,
Pennsylvania Power Company, The
Potomac Edison Company, Toledo
Edison Company, Trans-Allegheny
Interstate Line Company, and West
Penn Power Company*

Kenneth B. Driver
Email: kbdriver@jonesday.com
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-7629

*Counsel for Petitioner/Intervenor
Oklahoma Gas and Electric Company*

Clare E. Kindall
Department Head – Energy
Email: Clare.Kindall@ct.gov
OFFICE OF THE ATTORNEY GENERAL
Ten Franklin Square
New Britain, CT 06051
Telephone:  (860) 827-2683

*Counsel for Intervenor Connecticut
Public Utilities Regulatory Authority*

John L. Shepherd, Jr.
Email: John.Shepherd@skadden.com
William Rainey Barksdale
Email:
William.Barksdale@skadden.com
Karis Anne Gong
Email: Karis.Gong@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7000

Tamara L. Linde
Email: Tamara.Linde@PSEG.com
Jodi L. Moskowitz
Email: Jodi.Moskowitz@PSEG.com
PSEG SERVICES CORPORATION
80 Park Plaza, T5G
Newark, NJ 07102-4194
Telephone: (973) 430-6409

*Counsel for Petitioners/Intervenors
PSEG Energy Resources & Trade LLC,
PSEG Power LLC, Public Service
Electric and Gas Company, Public
Service Enterprise Group Inc.*

Cynthia B. Miller
Associate General Counsel
Email: cmiller@psc.state.fl.us
FLORIDA PUBLIC SERVICE COMMISSION
2540 Shumard Oak Boulevard
Tallahassee, FL 32399-0862
Telephone: (850) 413-6082

*Counsel for Intervenor
Florida Public Service Commission*


Daniel M. Malabonga
Email: dmmalabonga@venable.com
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 344-4508


Stephen G. Kozey
Vice-President, Secretary, and General
Counsel
Email: stevekozey@misoenergy.org
Mathew R. Dorsett
Attorney
Email: mdorsett@misonergy.org
MIDCONTINENT INDEPENDENT SYSTEM
OPERATOR, INC.
P.O. Box 4202
Carmel, IN 46082-46032
Telephone: (317) 249-5431

*Counsel for Intervenor Midcontinent
Independent System Operator, Inc.*


Gary E. Guy
Email: gary.e.guy@bge.com
BALTIMORE GAS AND ELECTRIC
COMPANY
2 Center Plaza, 13th Floor
110 West Fayette Street
Baltimore, MD 21201-0000
Telephone: (410) 470-1337


Jeanne Jackson Dworetzky, Assistant
General Counsel
Email:
jeanne.dworetzky@exeloncorp.com
EXELON CORPORATION
101 Constitution Avenue, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 347-7500

*Counsel for Intervenor Exelon
Corporation*


Barry S. Spector
Email: spector@wrightlaw.com
Matthew J. Binette
Email: binette@wrightlaw.com
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3802
Telephone: (202) 393-1200

*Counsel for Intervenor
Southwest Power Pool, Inc.*

N. Beth Emery
Email:
Beth.Emery@HuschBlackwell.com
HUSCH BLACKWELL LLP
755 E. Mulberry Street, Suite 200
San Antonio, TX 78212
Telephone: (210) 244-8802

*Counsel for Intervenors Sunflower Electric Power Corporation and Mid-Kansas Electric Company, LLC*

Daniel E. Frank
Email: daniel.frank@sutherland.com
Jennifer J.K. Herbert
Email: jj.herbert@sutherland.com
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, DC 20001-3980
Telephone: (202) 383-0100

*Counsel for Western Farmers Electric Cooperative*

James Bradford Ramsay
General Counsel
Email:  jramsay@naruc.org
Holly Rachel Smith
Assistant General Counsel
Email: hsmith@naruc.org
NATIONAL ASSOCIATION OF
 REGULATORY UTILITY
 COMMISSIONERS*
 *(intervention pending)
1101 Vermont Ave., NW
Suite 200
Washington, DC 20005
Telephone: (202) 898-1350

*Counsel for Intervenor National Association of Regulatory Utility Commissioners*

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

The undersigned Petitioners and Intervenors respectfully file this Certificate as to Parties, Rulings, and Related Cases.  Fed. R. App. P. 28(a)(1); D.C. Cir. R. 28(a)(1).

## I.    **PARTIES**

This case is before the Court on petitions for review from final orders in a Federal Energy Regulatory Commission ("FERC") rulemaking proceeding to which there were no formal parties.  The following are parties to the proceeding in this Court:

| | |
|---|---|
| Petitioners:<br>(Many of the Petitioners Intervened in other consolidated cases) | Alabama Public Service Commission (Case No. 12-1299)<br>American Public Power Association (Case No. 12-1296)<br>Coalition for Fair Transmission Policy (Case No. 12-1233)<br>Edison Electric Institute (Case No. 12-1279)<br>First Energy Companies  (Case No. 12-1285) (American Transmission Systems Incorporated, Cleveland Electric Illuminating Company, FirstEnergy Solutions Corp., Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Ohio Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, The Potomac Edison Company, Toledo Edison Company, Trans-Allegheny Interstate Line Company, West Penn Power Company)<br>International Transmission Company, d/b/a ITCTransmission, Michigan Electric |

Transmission Company LLC, ITC Midwest LLC,
ITC Great Plains LLC (Case No. 12-1304)

Large Public Power Council (Case No. 12-1292)

Midwest ISO Transmission Owners (Case No. 12-1448)

National Rural Electric Cooperative Association (Case No. 12-1280)

New York Independent System Operator, Inc. (Case No. 12-1293)

Oklahoma Gas and Electric Company (Case No. 12-1478)

PSEG Energy Resources & Trade LLC, PSEG Power LLC, Public Service Electric and Gas Company, Public Service Enterprise Group Inc. (Case No. 12-1250)

Sacramento Municipal Utility District (Case No. 12-1276)

South Carolina Public Service Authority (Case No. 12-1232)

Southern Company Services, Inc. (Case No. 12-1300)

Respondent:                         Federal Energy Regulatory Commission

Intervenors:                        American Wind Energy Association
                                    Avista Corporation
                                    California Independent System Operator Corporation
                                    Central Hudson Gas & Electric Corporation
                                    City of Santa Clara, CA d/b/a Silicon Valley Power
                                    Connecticut Public Utilities Regulatory Authority
                                    Conservation Law Foundation
                                    Consolidated Edison Company of New York, Inc.
                                    Dayton Power and Light Company
                                    E.ON Climate & Renewables North America, LLC
                                    Environmental Defense Fund
                                    Exelon Corporation
                                    Florida Public Service Commission
                                    Long Island Lighting Company d/b/a/ LIPA
                                    Long Island Power Authority
                                    Lower Mount Bethel Energy, LLC
                                    LS Power Transmission, LLC

LSP Transmission Holdings, LLC
Mid-Kansas Electric Company, LLC
Midcontinent Independent System Operator, Inc.
  (formerly,  Midwest Independent Transmission
  System Operator, Inc.)
Modesto Irrigation District
M-S-R Public Power Agency
Natural Resources Defense Council
New Jersey Board of Public Utilities
New York Power Authority
New York State Electric & Gas Corporation
Niagara Mohawk Power Corporation
Old Dominion Electric Cooperative
Orange and Rockland Utilities, Inc.
PPL Electric Utilities Corporation
PPL EnergyPlus, LLC
PPL Brunner Island, LLC
PPL Holtwood, LLC
PPL Martins Creek, LLC
PPL Montour, LLC
PPL Susquehanna, LLC
PPL New Jersey Solar, LLC
PPL New Jersey Biogas, LLC
PPL Renewable Energy, LLC
Public Utilities Commission of the State of
  California
Puget Sound Energy, Inc.
Rochester Gas and Electric Corporation
Southwest Power Pool, Inc.
Sunflower Electric Power Corporation
Transmission Access Policy Study Group
Transmission Agency of Northern California
Transmission Dependent Utility Systems
Union of Concerned Scientists
Western Farmers Electric Cooperative
National Association of Regulatory Utility
  Commissioners (intervention pending)

## II.    RULINGS UNDER REVIEW

Under review in this proceeding are the following final orders of the Federal Energy Regulatory Commission with the Commission issuance date and the *Federal Register* publication dates shown for each:

1) *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities,* Order No. 1000, Final Rule, Docket No. RM10-23-000, 136 FERC ¶ 61,051 (July 21, 2011), 76 Fed. Reg. 49,842 (Aug. 11, 2011);

2) *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities,* Order No. 1000-A, Order on Rehearing and Clarification, Docket No. RM10-23-001, 139 FERC ¶ 61,132 (May 17, 2012), 77 Fed. Reg. 32,184 (May 31, 2012); and

3) *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities,* Order No. 1000-B, Order on Rehearing and Clarification, Docket No. RM10-23-002, 141 FERC ¶ 61,044 (Oct. 18, 2012), 77 Fed. Reg. 64,890 (Oct. 24, 2012).

## III.    RELATED CASES

The orders under review have not previously been before this Court or any other court.  One of the issues in this consolidated petition for review is whether FERC exceeded its statutory authority, and usurped state jurisdiction, by requiring transmission providers to remove from tariffs and contracts any right of first refusal that utilities have to construct and own new transmission facilities.  That

question is also before this Court in *Public Service Electric & Gas Co. v. FERC*, No. 12-1382 (D.C. Cir. Filed Sept. 17, 2012), but it is presented in the narrower context of a single Regional Transmission Operator, rather than a national rule. Counsel is not aware of any other related cases pending before this or any other court.

/s/ *Andrew W. Tunnell*
Andrew W. Tunnell
*Counsel for Petitioner/Intervenor Southern Company Services, Inc.*

*And on behalf of Petitioners and Intervenors South Carolina Public Service Authority, the Large Public Power Council, and Sacramento Municipal Utility District; Alabama Public Service Commission; American Public Power Association; Coalition for Fair Transmission Policy;  Edison Electric Institute;  Exelon Corporation; American Transmission Systems Incorporated, Cleveland Electric Illuminating Company, FirstEnergy Solutions Corp., Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Ohio Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, The Potomac Edison Company, Toledo Edison Company, Trans-Allegheny Interstate Line Company, and West Penn Power Company; Midwest ISO Transmission Owners; National Rural Electric Cooperative Association; New York Independent System Operator, Inc.; New York Transmission Owners,*

*Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Power Authority, New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation d/b/a National Grid, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation; Oklahoma Gas and Electric Company; PSEG Energy Resources & Trade LLC, PSEG Power LLC, Public Service Electric and Gas Company, Public Service Enterprise Group Inc.; Connecticut Public Utilities Regulatory Authority; Florida Public Service Commission; Southwest Power Pool, Inc.; Midcontinent Independent System Operator, Inc.; Sunflower Electric Power Corporation and Mid-Kansas Electric Company, LLC; Western Farmers Electric Cooperative; National Association of Regulatory Utility Commissioners (intervention pending)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of both the Fed. R. App. P. and the D. C. Cir. R., the undersigned counsel on behalf of Petitioners and Intervenors identified in the signature block below discloses the following:

Petitioners

**Alabama Public Service Commission** (Case No. 12-1299) is not required to provide a Corporate Disclosure Statement because it is a governmental entity organized under the laws of the State of Alabama.

**American Public Power Association ("APPA")** (Case No. 12-1296) has no parent corporation or publicly traded stock. It is the national service organization representing the interests of not-for-profit, publicly owned electric utilities throughout the United States. More than 2,000 public power utilities, doing business in every state except Hawaii, serve more than 47 million Americans. APPA was created in 1940 as a nonprofit, non-partisan organization. Its purpose is to advance the public policy interests of its members and their consumers, and provide member services to ensure adequate, reliable electricity at a reasonable price with the proper protection of the environment. It is a trade association within the meaning of Circuit Rule 26.1(b).

**Coalition for Fair Transmission Policy ("CFTP")** (Case No. 12-1233) is an unincorporated professional association or group of geographically and structurally diverse investor-owned electric utilities formed for the purpose of supporting legislative and regulatory policies that will lead to customer-focused development of the nation's electric transmission systems and clean generation resources.

**Edison Electric Institute ("EEI")** (Case No. 12-1279) is the trade association of U.S. shareholder-owned electric companies and represents approximately 70 percent of the U.S. electric power industry.  EEI's members operate in all regions of the country and rely on transmission resources directly affected by the FERC orders under review.  EEI is a non-stock corporation with no parent companies, and no publicly-held company has an ownership interest in EEI.

**The "FirstEnergy Companies" (American Transmission Systems, Incorporated, The Cleveland Electric Illuminating Company, FirstEnergy Solutions Corp., Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Ohio Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, The Potomac Edison Company, The Toledo Edison Company, Trans-Allegheny Interstate Line Company, and West Penn Power Company)** (Case No. 12-1285) are subsidiaries of FirstEnergy Corp., a holding company engaged through its

viii

subsidiaries, in the generation, transmission and distribution of power throughout the eastern portion of the United States.  There is no publicly held company that owns more than 10% of FirstEnergy Corp.  Each of the FirstEnergy Companies owns or operates electric generation, transmission, or distribution facilities, or a combination thereof.  They are engaged in the provision of electric services in the states of New Jersey, Ohio, Pennsylvania, and West Virginia.

**Large Public Power Council ("LPPC")** (Case No. 12-1292) is a not-for-profit trade association representing 25 of the nation's largest municipal and state-owned utilities.  LPPC's members own approximately 90% of the transmission investment owned by nonfederal public power utilities.  LPPC does not have any parent entity, and does not have publicly-traded stock.

**The "Midwest ISO Transmission Owners," including Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois; City Water, Light & Power (Springfield, IL); Dairyland Power Cooperative; Great River Energy; Hoosier Energy Rural Electric Cooperative, Inc.; Indianapolis Power & Light Company; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water Light & Power Company); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company; Northern States Power Company, a Minnesota**

**corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a Vectren Energy Delivery of Indiana); Southern Minnesota Municipal Power Agency; and Wolverine Power Supply Cooperative, Inc.** (Case No. 12-1448) state they are a group of investor-owned transmission owners, cooperatives, and municipals that own transmission facilities over which the Midcontinent Independent System Operator, Inc. (formerly, Midwest Independent Transmission System Operator, Inc.) provides transmission service.   The Midwest ISO Transmission Owners were active participants in the Commission proceeding below and sought rehearing of Order Nos. 1000 and 1000-A.   The Midwest ISO Transmission Owners are subject to, and will be affected by, the requirements of Order Nos. 1000, 1000-A, and 1000-B.

- Ameren Services Company ("Ameren Services") is a corporation organized and existing under the laws of the state of Missouri with its principal place of business in St. Louis, Missouri.  Ameren Services is a wholly-owned subsidiary of Ameren Corporation ("Ameren") that provides administrative support services to Ameren and its operating companies, subsidiaries, and affiliates.   Union Electric Company, d/b/a Ameren Missouri, Ameren Illinois Company, d/b/a Ameren

Illinois, and Ameren Transmission Company of Illinois (collectively, the "Operating Companies") are all wholly-owned subsidiaries of Ameren. Together, the Operating Companies provide public utility service to approximately 2.3 million electric customers and more than 900,000 natural gas customers across nearly 64,000 square miles in Illinois and Missouri.

- City Water, Light & Power is the operating name of the Office of Public Utilities, a division of the City of Springfield, Illinois, a home rule municipal corporation and political subdivision of the state of Illinois, organized and existing pursuant to the Illinois Constitution. The City of Springfield is a political subdivision, and no publicly owned corporation has any ownership share in the City or its electric system. City Water, Light & Power is a municipal electric utility engaged in the transmission, generation, and distribution of electricity to customers in the City of Springfield and surrounding environs.

- Dairyland Power Cooperative ("Dairyland") is a non-stock cooperative association organized under the laws of the state of Wisconsin, with its principal office located in La Crosse, Wisconsin. Dairyland is engaged, among other things, in the businesses of

generating and transmitting electric power to its 25 member distribution cooperatives and to other wholesale customers. Dairyland has no corporate parent. No publicly held corporations have a 10% or greater ownership interest in Dairyland.

- Great River Energy ("GRE") is a non-stock generation and transmission ("G&T") Cooperative Corporation organized under the laws of the state of Minnesota that supplies the majority of the electric requirements for twenty-eight (28) member distribution cooperatives in Minnesota and Wisconsin. As a G&T cooperative, GRE owns or contracts for 3,487 MW of generating capacity and 4,577 miles of transmission facilities in Minnesota, North Dakota, and Wisconsin. GRE does not have a parent corporation and has not issued shares to the public. No publicly held company has a 10% or greater ownership interest in GRE.

- Hoosier Energy Rural Electric Cooperative, Inc. ("Hoosier Energy") has no parent company or controlling entity. Hoosier Energy has no stock or partnership share ownership. Hoosier Energy is a generation and transmission cooperative serving seventeen local rural electric membership cooperatives in southern and central Indiana and one

rural electric membership cooperative in southeastern Illinois. Hoosier Energy owns generation, transmission, and substation facilities and delivers power at the wholesale level only. Hoosier Energy's purpose is to generate and procure power to meet the needs of its member system demands at the lowest cost possible and deliver this power in the most reliable manner possible.

- Indianapolis Power & Light Company ("IPL") is a corporation organized under and existing under the laws of the state of Indiana with its principal place of business in Indianapolis, Indiana. IPL is a subsidiary of Ipalco Enterprises, Inc. ("IPALCO"). IPALCO is a subsidiary of AES Corporation ("AES"). IPL is a public utility company subject to the jurisdiction of the FERC and the requirements of the FERC orders at issue in this proceeding. AES is a Delaware corporation with its principal place of business in Arlington, Virginia. AES has issued shares of stock and debt securities to the public.

- MidAmerican Energy Company ("MidAmerican") is an Iowa corporation that provides electric and/or gas utility services to customers in Iowa, Illinois, Nebraska, and South Dakota. Its principal place of business is at 666 Grand Avenue, Des Moines, IA, 50306-

0657.  MidAmerican was incorporated in the State of Iowa on July 18, 1994 and is an indirect subsidiary of MidAmerican Energy Holdings Company ("MEHC"), an Iowa corporation.   Intermediate parent entities of MidAmerican are MHC Inc. and MidAmerican Funding, LLC.   No publicly-held company owns 10% or more of MidAmerican's voting equity securities.  Neither MHC Inc., which is 100% owned by MidAmerican Funding, LLC, nor MidAmerican Funding, LLC, which is owned 100% by MEHC, have publicly traded equity securities.   MEHC is a consolidated subsidiary of Berkshire Hathaway Inc., a publicly traded entity, which owns approximately 89.8% of the voting equity of MEHC.  The preceding is a matter of public record.

- ALLETE, Inc., d/b/a Minnesota Power is a Minnesota public utility company which also owns Superior Water Light & Power Company, a Wisconsin public utility company.  There is no public company that owns a 10% or greater share in ALLETE, Inc.

- Montana-Dakota Utilities Co. is a division of MDU Resources Group, Inc., a Delaware corporation.   Montana-Dakota Utilities Co. is engaged in the distribution of natural gas and the generation,

transmission, and distribution of electricity in the states of North

Dakota, South Dakota, Montana, and Wyoming.

- Northern Indiana Public Service Company ("NIPSCO") is an Indiana corporation engaged in the generation, transmission, and distribution of energy at wholesale and retail. NIPSCO is a wholly-owned subsidiary of NiSource Inc. ("NiSource"). NiSource is a public utility holding company that has outstanding securities in the hands of the public.

- Northern States Power Company, a Minnesota corporation ("NSPM") and Northern States Power Company, a Wisconsin corporation ("NSPW"), are combination electric and natural gas public utilities and wholly-owned utility operating company subsidiaries of Xcel Energy Inc.[1] NSPM operates in the states of Minnesota, North Dakota, and South Dakota, and NSPW operates in the states of Wisconsin and Michigan. NSPM's public utility operations are subject to regulation by, *inter alia,* the Minnesota Public Utilities Commission, the North Dakota Public Service Commission, and the

---

[1] The other public utility operating company subsidiaries of Xcel Energy Inc. are Public Service Company of Colorado and Southwestern Public Service Company.

South Dakota Public Utilities Commission. NSPW's public utility operations are subject to regulation by, *inter alia,* the Public Service Commission of Wisconsin and the Michigan Public Service Commission. The wholesale electric utility operations of NSPM and NSPW are subject to regulation by the FERC.[2] The securities of Xcel Energy Inc. are publicly traded. No publicly held company owns 10% or more of Xcel Energy Inc. stock.

- Northwestern Wisconsin Electric Company ("NWE") is an investor-owned utility. No corporation, partnership, or business trust owns a controlling interest in NWE. No publicly held corporation owns of record, or to NWE's knowledge owns beneficially, 10% or more of NWE's common stock. NWE is a corporation organized under Wisconsin law, providing electric service in Polk and Burnett Counties in northwestern Wisconsin, distributing electricity to approximately 12,000 customers. NWE also serves approximately 85 retail customers in Pine County in northeastern Minnesota. NWE is a

---

[2] In addition, certain operating company subsidiaries of Xcel Energy Inc., including NSPM and NSPW, have issued first mortgage bonds and other debt securities. A complete list of all debt securities of Xcel Energy Inc. subsidiaries is available at the Xcel Energy Inc. web site (www.xcelenergy.com) under Investor Relations.

public utility as defined in Chapter 196 of the Wisconsin Statutes, subject to the regulation of the Public Service Commission of Wisconsin.  NWE does not file for equity return approval from FERC. NWE's rates are set by the Public Service Commission of Wisconsin.

• Otter Tail Power Company is an electric utility providing electrical service to customers in Minnesota, North Dakota, and South Dakota. Otter Tail Power Company is a wholly-owned subsidiary of Otter Tail Corporation, an investor-owned company with diversified interests that also include manufacturing and construction services.  Otter Tail Corporation does not have any parent companies and no publicly held corporation has a 10% or greater ownership interest in Otter Tail Corporation.

• Southern Illinois Power Cooperative ("SIPC") does not have any parent company and no publicly held company holds a 10% or greater share in SIPC.  SIPC is a Generation and Transmission Cooperative that has All Load requirement contracts with 6 member distribution cooperatives.  SIPC is responsible for providing kilowatt hours at the lowest possible cost to its member distribution cooperatives.

- Southern Indiana Gas & Electric Company's parent is Vectren Corp., with Vectren Utility Holdings as the intermediate parent. Vectren Corp. is the holder of interest in Southern Indiana Gas & Electric Company. Southern Indiana Gas & Electric Company is a public electric generating utility organized and existing under the laws of the state of Indiana, and has its principal office at 211 N.W. Riverside Dr., Evansville, Indiana 47708. It is engaged in rendering electric public utility service in the state of Indiana, and owns, operates, manages, and controls, among other things, plant and equipment within the state of Indiana used for the production, transmission, delivery, and furnishing of such services to the public. Southern Indiana Gas & Electric Company provides retail electric service to approximately 140,000 customers in six counties in southwestern Indiana.

- Southern Minnesota Municipal Power Agency ("SMMPA") is a joint action agency comprised of 18 member municipalities in Minnesota which own and operate municipal electric systems. SMMPA is a non-profit political subdivision of the state of Minnesota organized under Chapter 453 of the Minnesota Statutes. SMMPA functions as the principal power supplier for its 18 members.

- Wolverine Power Supply Cooperative, Inc. ("Wolverine") is a non-profit generation and transmission electric cooperative. Wolverine is organized under the laws of the state of Michigan and provides wholesale service to five distribution cooperative members that resell power at retail to approximately 268,000 customers located in Michigan and Indiana. Wolverine's two other members are alternative retail electric suppliers in Michigan. Wolverine's members are both its customers and its owners. Wolverine has no publicly-issued stock.

**National Rural Electric Cooperative Association ("NRECA")** (Case No. 12-1280) is a not-for-profit national service organization (with no parent entity or publicly-traded stock) and a trade association under Circuit Rule 26.1(b).

**New York Independent System Operator, Inc. ("NYISO")** (Case No. 12-1293) is a not-for-profit corporation organized under laws of the State of New York. Although it does not own or control any electric power generation facilities, it possesses operational control over the transmission facilities and it is responsible for the operation of the bulk power system in the State of New York. The NYISO is the independent body responsible for providing open access transmission-service, maintaining reliability, and administering competitive wholesale electricity markets in New York State. The NYISO is not a publicly held company, and no

publicly held company has a 10% or greater ownership interest in the NYISO.  The NYISO does not have a parent company nor any affiliates.

**Oklahoma Gas and Electric Company** (Case No. 12-1478) is a wholly owned subsidiary of OGE Energy Corp., which is a publicly held corporation.  No publicly held corporation owns 10% or more of the stock of OGE Energy Corp.

**Public Service Enterprise Group Incorporated ("PSEG"), Public Service Electric and Gas Company ("PSE&G"), PSEG Power LLC ("PSEG Power"), and PSEG Energy Resources & Trade LLC ("PSEG ER&T")** (Case No. 12-1250).   PSE&G and PSEG Power are each wholly owned direct subsidiaries of PSEG.   PSEG ER&T is a wholly owned indirect subsidiary of PSEG and a direct subsidiary of PSEG Power.  The principal and executive offices of PSEG, PSE&G, PSEG Power and PSEG ER&T are located at 80 Park Plaza, Newark, New Jersey 07102.  PSEG is an exempt public utility holding company incorporated under the laws of the State of New Jersey.   PSEG is engaged in, among other things, the generation, transmission, and sale of electric energy through its subsidiaries.  PSE&G is a public utility company organized under the laws of the State of New Jersey.   PSE&G is presently engaged in, among other things, the transmission and distribution of electricity and the distribution of natural gas in New Jersey.   PSE&G owns transmission facilities in PJM Interconnection, L.L.C.   ("PJM").   PSEG Power, a Delaware limited liability

company, is a wholesale energy supply company that integrates its generation asset operations with its wholesale energy, fuel supply, energy trading and marketing, and risk management functions through three principal subsidiaries: (i) PSEG Nuclear LLC ("PSEG Nuclear"), which owns and operates nuclear generating stations; (ii) PSEG Fossil LLC ("PSEG Fossil"), which develops, owns, and operates domestic fossil-fuel fired and other non-nuclear generating stations; and, (iii) PSEG ER&T, which is described below. PSEG ER&T, a Delaware limited liability company, sells power and energy and certain ancillary services at market-based rates. PSEG ER&T markets the capacity and production of PSEG Nuclear's and PSEG Fossil's generating stations, manages the commodity price risks and market risks related to generation, and provides gas supply services. PSEG ER&T is engaged in extensive asset based energy trading operations throughout the Northeast. PSEG has publicly-held common stock outstanding. PSE&G has publicly-held debt securities outstanding. PSE&G Transition Funding LLC and PSE&G Transition Funding II LLC, each a wholly-owned subsidiary of PSE&G, have publicly-held debt securities outstanding. PSEG Power has publicly-held debt securities outstanding.

**Sacramento Municipal Utility District ("SMUD")** (Case No. 12-1276) is not required to provide a Corporate Disclosure Statement because it is a governmental entity organized under the laws of the State of California.

**South Carolina Public Service Authority** (Case No. 12-1232) is not required to provide a Corporate Disclosure Statement because it is a governmental entity organized under the laws of the State of South Carolina.

**Southern Company Services, Inc. ("SCS")** (Case No. 12-1300) is the services company for The Southern Company, a registered public utility holding company, organized under the laws of the State of Delaware and having its principal place of business in Atlanta, Georgia. The Southern Company owns all of the outstanding shares of common stock of SCS and of five (5) electricity utility subsidiaries: Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, and Southern Power Company (collectively the "Operating Companies"). The four Retail Operating Companies (Alabama Power, Georgia Power, Gulf Power and Mississippi Power) are engaged in the manufacture, generation, transmission, and sale of electricity and serve both retail and wholesale customers within specified franchised electric service territories in portions of Alabama, Georgia, Florida and Mississippi, respectively. Southern Power Company is engaged in the manufacture, generation and sale of electricity and serves only wholesale customers. SCS acts as agent for the Operating Companies with respect to the execution and administration of certain contracts and in proceedings at the Federal Energy Regulatory Commission. As to the four Retail Operating Companies, SCS also provides services in connection

xxii

with the coordination and oversight of system-wide, integrated resource and transmission facility planning processes.


**Intervenors**

**Connecticut Public Utilities Regulatory Authority** ("CT PURA") is a governmental entity.

**Exelon Corporation** is a holding company, headquartered at 10 South Dearborn Street, Chicago, Illinois, with operations and business activities in 47 states, the District of Columbia and Canada. Exelon owns Commonwealth Edison Company (ComEd), Baltimore Gas and Electric Company (BGE) and PECO Energy Company (PECO). Together ComEd, BGE and PECO own electric transmission and electric distribution systems that deliver electricity to approximately 6.6 million customers in central Maryland (BGE), Northern Illinois (ComEd) and southeastern Pennsylvania (PECO). PECO distributes natural gas to nearly 500,000 consumers in the suburban Philadelphia area. BGE distributes natural gas to over 600,000 customers in central Maryland and also operates a liquefied natural gas facility for the liquefaction and storage of natural gas as well as associated propane facilities. ComEd, BGE and PECO are members of PJM Interconnection, L.L.C. (PJM). Exelon Generation is the largest competitive power generator in the U.S., with approximately 35,000 megawatts of owned

capacity comprising one of the nation's cleanest and lowest-cost power generation fleets, located in a number of organized markets.  The company's Constellation business unit is one of the nation's leading marketers of electricity and natural gas and related products in wholesale and retail markets.  These businesses serve approximately 100,000 business and public sector customers and approximately one million residential customers in various markets throughout the United States.

**Florida Public Service Commission** is a governmental entity organized under the laws of the State of Florida.

**Midcontinent Independent System Operator, Inc. ("MISO")** (formerly, Midwest Independent Transmission System Operator, Inc.)  is a Commission-approved Regional Transmission Organization and is responsible for providing transmission service and administering energy, ancillary service, and operating reserve markets in the Midwest pursuant to the rates, terms, and conditions of its tariff.  MISO is a Delaware non-stock, not-for-profit corporation that has no equity or stock.  Thus, it is not subject to the corporate disclosure statement requirement of Rule 26.1 of this Court or Rule 26.1 of the Federal Rules of Appellate Procedure.

**Mid-Kansas Electric Company, LLC ("Mid-Kansas")**.  Mid-Kansas is a limited liability corporation organized under the laws of the State of Kansas and operated on a non-profit basis.  Its principal place of business is in Hays, Kansas.

Mid-Kansas is owned by five rural electric distribution cooperatives, all non-profit corporations organized under the laws of the State of Kansas, and one corporation that is a wholly-owned subsidiary of a Kansas distribution cooperative.   Mid-Kansas does not issue stock and no publicly held corporation owns any part of the entity.

**The "New York Transmission Owners," including Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Power Authority, New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation d/b/a National Grid, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation,** state that they are a group of eight electric systems in the State of New York that own the transmission facilities operated by the NYISO. The New York Transmission Owners were active participants in the Commission proceeding below and sought rehearing of Order No. 1000.   The New York Transmission Owners are subject to, and will be affected by, the requirements of Order Nos. 1000, 1000-A and 1000-B.

•     Central Hudson Gas & Electric Corporation ("CHGE") is a corporation created and organized under the laws of the State of New York, with its principal offices in Poughkeepsie, New York.  CHGE is an electric and natural gas utility engaged in, among other things, the businesses of (1) distributing natural

gas for residential, commercial and industrial use, and (2) transmitting and distributing electric power to wholesale and retail customers, and transmitting electric power on behalf of third parties. CHGE's transmission of electric power in interstate commerce is regulated by FERC. CHGE is a wholly owned subsidiary of CH Energy Group, Inc. ("CH Energy"). In addition to CHGE, CH Energy's other wholly owned subsidiary is Central Hudson Enterprises Corporation ("CHEC"). CHEC's subsidiaries include Griffith Energy Services, Inc., CH-Auburn Energy, LLC, CHGreentree, LLC, CH Shirley Wind, LLC, and CH-Lyonsdale, LLC. CHEC also is a majority owner of Lyonsdale Biomass, LLC. Other than CH Energy and CHGE, none of its affiliate or subsidiary companies has issued shares of debt or equity securities to the public.

• Consolidated Edison Company of New York, Inc. ("Con Edison") is a regulated public utility, incorporated in the State of New York, engaged in the generation, transmission, distribution and wholesale and retail sale of electric power and the retail sale of steam and gas throughout the five boroughs of New York City and in the County of Westchester and the retail sale of gas and steam in parts of New York City. Con Edison has outstanding shares and debt securities held by the public and may issue additional securities to the public. Con Edison is a subsidiary of Consolidated Edison, Inc., which also has outstanding shares and debt held by the public and may issue additional securities to the public. Con

Edison is also affiliated with Orange and Rockland Utilities, Inc. ("O&R"), a subsidiary of Consolidated Edison, Inc., which also has outstanding debt securities held by the public and may issue additional securities to the public. O&R has two subsidiaries, Pike County Light and Power and Rockland Electric Company, which may issue debt securities to the public. No other publicly held companies have a 10 percent or greater ownership interest in Con Edison.

•    Long Island Power Authority ("LIPA") is a corporate municipal instrumentality and a political subdivision of the State of New York. LIPA is a wholly-owned operating subsidiary of the Authority, which was formed and exists under the Business Corporation Law of the State of New York. All of LIPA's outstanding stock is owned by the Authority. Neither LIPA nor the Authority has any parent companies, subsidiaries, or affiliate that has any outstanding shares that are owned by the public. LIPA is a transmission-owning member of the NYISO.

•    New York Power Authority ("NYPA") is a corporate municipal instrumentality and a political subdivision of the State of New York ("State"), organized under the laws of the State, and operating pursuant to Title I of the Article 5 of the New York Public Authorities Law. NYPA has no companies, subsidiaries, or affiliates that have any outstanding shares that are owned by the public. NYPA generates, transmits and sells electric power and principally at wholesale. NYPA's customers include various public corporations located within

xxvii

the metropolitan area of New York City, as well as businesses, municipal and rural electric cooperative customers located throughout the State. NYPA is also a transmission owner member of the NYISO.

• Niagara Mohawk Power Corporation d/b/a National Grid ("Niagara Mohawk") is a regulated public utility, incorporated in the State of New York, engaged in the transmission, distribution and wholesale and retail sale of electric power and the retail sale of gas in Buffalo, Albany, Syracuse and other portions of upstate New York. Niagara Mohawk is a Transmission Owner member of the New York Independent System Operator, Inc. Niagara Mohawk is a wholly owned subsidiary of Niagara Mohawk Holdings Inc.

• Orange and Rockland Utilities, Inc. ("O&R") is a regulated public utility, operating in Orange, Rockland and part of Sullivan counties in New York State and in parts of Pennsylvania and New Jersey. O&R is engaged in the transmission, distribution and wholesale and retail sale of electric power and gas. O&R is a subsidiary of Consolidated Edison, Inc., which also has outstanding debt securities held by the public and may issue additional securities to the public. O&R has two subsidiaries, Pike County Light and Power and Rockland Electric Company, which may issue debt securities to the public. O&R is also affiliated with Con Edison, a subsidiary of Consolidated Edison, Inc. Con Edison has

xxviii

outstanding shares and debt securities held by the public.  No other publicly held companies have a 10 percent or greater ownership interest in O&R.

•      New York State Electric & Gas Corporation, and Rochester Gas and Electric Corporation are wholly owned subsidiaries of Iberdrola USA, Inc., which in turn is wholly owned by Iberdrola S.A., an international energy company listed on the Madrid Stock Exchange.  Mohawk Holdings Inc. is wholly owned by National Grid USA.  National Grid USA is wholly owned by National Grid Holdings Inc., which is wholly owned by National Grid (US) Partner 1 Ltd. National Grid (US) Partner 1 Ltd. is wholly owned by National Grid (US) Investments 4 Ltd., which is wholly owned by National Grid (US) Holdings Ltd., which is wholly owned by National Grid plc.  National Grid plc's ordinary shares are listed on the London Stock Exchange.  National Grid plc's stock is also held by U.S. investors through American Depositary Shares which are listed on the New York Stock Exchange.  Preferred shares of Niagara Mohawk are listed and traded on the New York Stock Exchange, while Niagara Mohawk's common stock is not publicly traded.

**Sunflower Electric Power Corporation ("Sunflower")**.  Sunflower is a non-profit corporation organized under the laws of the State of Kansas with its principal place of business in Hays, Kansas.  Sunflower is owned by six rural electric distribution cooperatives, all non-profit corporations organized under the

laws of the State of Kansas.  The Sunflower members and their headquarters are as follows:  Lane-Scott Electric Cooperative, Inc., Dighton, KS; Pioneer Electric Cooperative, Inc., Ulysses, KS; Prairie Land Electric Cooperative, Inc., Norton, KS; Victory Electric Cooperative Association, Inc., Dodge City, KS; Western Cooperative Electric Association, Inc., WaKeeney, KS; and Wheatland Electric Cooperative, Inc., Scott City, KS.  Sunflower does not issue stock and no publicly held corporation owns any part of the entity.

**Southwest Power Pool, Inc.** ("SPP") is a non-profit corporation organized under the laws of the state of Arkansas with its principal place of business in Little Rock, Arkansas.  As a Federal Energy Regulatory Commission-approved Regional Transmission Organization ("RTO"), SPP is a transmission provider currently administering electric transmission service over 48,930 miles of transmission lines covering portions of Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas. SPP has no parent corporation, and because SPP is a non-profit corporation that does not issue stock, no publicly held corporation owns 10% or more stock in SPP.

**Western Farmers Electric Cooperative ("WFEC")** is a generation and transmission cooperative headquartered in Anadarko, Oklahoma and financed by the Rural Utilities Service.  WFEC owns, operates, and maintains more than 3,400 miles of transmission lines located principally in Oklahoma. WFEC serves 23

distribution cooperative member-owners and Altus Air Force Base, which, in turn, serve the electric needs of their retail customers in Oklahoma, New Mexico, Kansas, Texas, and Arkansas.  As a not-for-profit electric cooperative owned by its members, WFEC does not have any parent companies, and no publicly-held company has a 10% or greater ownership interest in WFEC.

**National Association of Regulatory Utility Commissioners (NARUC)** is a quasi-governmental nonprofit organization founded in 1889 and incorporated in the District of Columbia.  NARUC is a "trade association" as that term is defined in Rule 26.1(b).  NARUC has no parent company.  No publicly held company has any ownership interest in NARUC.  NARUC represents those government officials in the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands, charged with the duty of regulating, *inter alia*, the regulated electric utilities within their respective borders.  (Intervention pending.)

xxxi

 /s/ *Andrew W. Tunnell*

Andrew W. Tunnell
*Counsel for Petitioner/Intervenor Southern Company Services, Inc.*

*And on behalf of Petitioners and Intervenors South Carolina Public Service Authority, the Large Public Power Council, and Sacramento Municipal Utility District; Alabama Public Service Commission; American Public Power Association; Coalition for Fair Transmission Policy; Edison Electric Institute;  Exelon Corporation; American Transmission Systems Incorporated, Cleveland Electric Illuminating Company, FirstEnergy Solutions Corp., Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Ohio Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, The Potomac Edison Company, Toledo Edison Company, Trans-Allegheny Interstate Line Company, and West Penn Power Company; Midwest ISO Transmission Owners; National Rural Electric Cooperative Association; New York Independent System Operator, Inc.; New York Transmission Owners, Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Power Authority, New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation d/b/a National Grid, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation; Oklahoma Gas and Electric Company; PSEG Energy Resources & Trade LLC, PSEG Power LLC,*

*Public Service Electric and Gas Company,*
*Public Service Enterprise Group Inc.;*
*Connecticut Public Utilities Regulatory*
*Authority; Florida Public Service*
*Commission; Midcontinent Independent*
*System Operator, Inc.; Southwest Power*
*Pool, Inc.; Sunflower Electric Power*
*Corporation and Mid-Kansas Electric*
*Company, LLC; Western Farmers Electric*
*Cooperative;  National Association of*
*Regulatory Utility  Commissioners*
*(intervention pending)*

# **TABLE OF CONTENTS**

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND
RELATED CASES.........................................................................i

I.     PARTIES .................................................................................i

II.    RULINGS UNDER REVIEW....................................................iv

III.   RELATED CASES...................................................................iv

CORPORATE DISCLOSURE STATEMENT ....................................... vii

TABLE OF AUTHORITIES ..........................................................xxxvi

GLOSSARY...................................................................................xl

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE CASE...............................................................2

STATEMENT REGARDING ADDENDUM............................................4

STATEMENT OF THE FACTS .............................................................4

I.     Historical Background..............................................................4

       A.     Voluntary Transmission Planning and Limits on FERC's
              Authority over Transmission Before Order No. 1000 .........4

       B.     Transmission Planning Conducted by Public Utilities Before
              Order No. 1000...............................................................11

II.    The Orders on Review ............................................................12

       A.     Development of the NOPR ...............................................12

       B.     The Orders....................................................................15

1.      FERC's Claimed Jurisdiction to Mandate
        Transmission Planning Requirements ......................................15

2.      Basis for the Orders:  FERC's "Theoretical Threat"...............17

3.      Cost Allocation ..........................................................................21

4.      Elimination of Rights of First Refusal and Imposition
        of Nonincumbent Requirements ...............................................23

5.      Public Policy Requirements.......................................................25

6.      Infringement Upon State Jurisdiction .......................................27

7.      Reciprocity for Non-Public Utility Transmission
        Providers ...................................................................................27

STANDARD OF REVIEW ................................................................29

STANDING ........................................................................................31

CERTIFICATE OF COMPLIANCE ..................................................38

CERTIFICATE OF SERVICE ...........................................................40

# TABLE OF AUTHORITIES

## CASES

*Atlantic City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002)..............................5, 9

*Carpenters & Millwrights v. NLRB*, 481 F.3d 804 (D.C. Cir. 2007) .....................31

\* *Central Iowa Power Coop. v. FERC,* 606 F.2d 1156 (D.C. Cir. 1979).................7

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).....................................30

*City of Arlington v. FCC*, Nos. 11-1545 & 11-1547, 2013 U.S. LEXIS
    3838 (U.S. May 20, 2013) ...............................................................30

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009) ............................................29

*Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) ..............24

*General Dynamics Land Sys. v. Cline*, 540 U.S. 581 (2004) ..................................30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................32

*Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361
    (D.C. Cir. 2004)..........................................................................9

*Military Toxics Project v EPA*, 146 F.3d 948 (D.C. Cir. 1998) .............................32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
    (1983).......................................................................................29

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S.
    967 (2005)...............................................................................30

\* *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831
    (D.C. Cir. 2006)........................................................................20

*New York v. FERC*, 535 U.S. 1 (2002) ....................................................................4

*Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973) ...............................5, 7

*Piedmont Envtl. Council v. FERC*, 558 F.3d 304 (4th Cir. 2009)............................6

*PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194 (D.C. Cir. 2005).............29

*PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203 (D.C. Cir. 2011).... 29, 31

*Transmission Agency of N. Cal. v. FERC,* 495 F.3d 663 (D.C. Cir. 2007) ............30

*Transmission Agency of N. Cal. v. FERC,* 628 F.3d 538 (D.C. Cir. 2010) ............30

*United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996) ......................31

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332
    (1956) .................................................................................................24

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................31

## **STATUTES**

5 U.S.C. § 706(2) ....................................................................................... 29, 31

15 U.S.C. § 717f ..............................................................................................5

16 U.S.C. § 824(a) .........................................................................................15

16 U.S.C. § 824(b) ...........................................................................................5

16 U.S.C. § 824a(a) .........................................................................................6

16 U.S.C. § 824a-1(b) ......................................................................................7

16 U.S.C. § 824e (2010) ............................................................................ 1, 15

16 U.S.C. § 824j-1 .........................................................................................10

16 U.S.C. § 824o ...........................................................................................10

16 U.S.C. § 824p (2006) ..................................................................................6

16 U.S.C. § 824q(b)(4) ...................................................................................10

16 U.S.C. § 825*l*(a) ..........................................................................................1

16 U.S.C. § 825*l*(b) .................................................................................... 1, 31

Conn. Gen. Stat. § 16-50j ................................................................................6

Fla Stat. Ann. § 366.04(5) ...............................................................................6

Fla. Stat. Ann. § 186.801 .................................................................................6

## **RULES**

Rule 25 (c), D.C. Cir. R. ........................................................................40

Rule 26.1(b), D.C. Cir. R. ..........................................vii, xix, xxiv, xxxi

Rule 26.1, Fed. R. App. P. ............................................................ vii, xxiv

Rule 28(a)(1), D.C. Cir. R....................................................................... i

Rule 28(a)(1), Fed. R. App. P. ............................................................... i

Rule 32(a)(2), D.C. Cir. R.....................................................................38

Rule 32(a)(7), Fed. R. App. P. .............................................................38

## **OTHER AUTHORITIES**

DOE, 2009 National Electric Transmission Congestion Study..............19

NERC 2009 Summer Reliability Assessment .......................................19

*New England Power Co.,* 52 FERC ¶ 61,090 (1990) ..................... 11, 12

*New Reporting Requirement Under the Federal Power Act and Changes
    to Form No. FERC-714*, FERC Stats. & Regs. ¶ 32,493 (1993)....................7

*PacifiCorp*, 72 FERC ¶ 61,087, 61,488 (1995) ....................................6

*Policy Statement Regarding Regional Transmission Groups*, FERC Stats.
    & Regs. ¶ 30,976 (1993).................................................................8

*Preventing Undue Discrimination and Preference in Transmission Serv.*,
    Order No. 890, FERC Stats. & Regs. ¶ 31,241, *order on reh'g and
    clarification*, Order No. 890-A, FERC Stats. & Regs. ¶ 31,261
    (2007)................................................................................. 10, 11

*Promoting Wholesale Competition Through Open Access Non-
    discriminatory Transmission Services by Public Utilities*, 60 Fed.
    Reg. 17662 (1995) ...........................................................................8

*Regional Transmission Organizations*, Order No. 2000, FERC Stats. &
    Regs. ¶ 31,089 (1999), *order on reh'g*, Order No. 2000-A, FERC

Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Public Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) ...............................................9

S.Rep.No. 621, 74th Cong., 1st Sess. 49 .................................................................7

# **GLOSSARY**

| | |
|---|---|
| Act | The Federal Power Act, 16 U.S.C. §§ 824 *et seq.* |
| Ad Hoc Coalition of Southeastern Utilities | Central Electric Power Cooperative, Inc.; Dalton Utilities; Georgia Transmission Corporation; JEA; MEAG Power; Orlando Utilities Commission; Progress Energy Service Company, LLC (on behalf of Progress Energy Carolinas, Inc. and Progress Energy Florida, Inc.); South Carolina Electric & Gas Company; South Carolina Public Service Authority (Santee Cooper); and Southern Company Services, Inc. (on behalf of Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, and Southern Power Company) |
| Ad Hoc Coalition of Southeastern Utilities Rehearing | Petition for Rehearing of the Ad Hoc Coalition of Southeastern Utilities, FERC Docket No. RM10-23-000 (Aug. 22, 2011), JA_____ |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* |
| Commission | The Federal Energy Regulatory Commission or its predecessor, the Federal Power Commission |
| FERC | Federal Energy Regulatory Commission |
| FirstEnergy or FirstEnergy Companies | American Transmission Systems Incorporated, Cleveland Electric Illuminating Company, FirstEnergy Solutions Corp., Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Ohio Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, The Potomac Edison Company, Toledo Edison Company, Trans-Allegheny Interstate Line Company, West Penn Power Company |
| FirstEnergy Rehearing | Request for Rehearing and Motion for Clarification of FirstEnergy Companies, FERC Docket No. RM10-23-001 (Aug. 22, 2011), JA_____ |

| | |
|---|---|
| FPA | The Federal Power Act, 16 U.S.C. § 824 *et seq.* |
| ISO | Independent System Operator |
| ISO-NE | ISO New England |
| Load-Serving Entity | "[A] distribution utility or an electric utility that has a service obligation."  FPA section 217(a)(1), 16 U.S.C.  § 824q(a)(1) |
| LPPC | Large Public Power Council, a Petitioner |
| LPPC Comments | Comments of the Large Public Power Council, FERC Docket No. RM10-23-000 (Sept. 29, 2010), JA_____ |
| Midwest ISO Transmission Owners | Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois; City Water, Light & Power (Springfield, IL); Dairyland Power Cooperative; Great River Energy; Hoosier Energy Rural Electric Cooperative, Inc.; Indianapolis Power & Light Company; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water Light & Power Company); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a Vectren Energy Delivery of Indiana); Southern Minnesota Municipal Power Agency; and Wolverine Power Supply Cooperative, Inc., Petitioners |
| Midwest ISO Transmission Owners NOPR Comments | Comments of the Midwest ISO Transmission Owners, FERC Docket No. RM10-23-000 (Sept. 29, 2010), JA____ |

| | |
|---|---|
| MISO | The Midwest Independent Transmission System Operator, Inc. (now, Midcontinent Independent System Operator) |
| NERC | North American Electric Reliability Corporation |
| NYISO | New York Independent System Operator, Inc. |
| New York Transmission Owners | Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Power Authority, New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation d/b/a National Grid, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation |
| NOPR | Notice of Proposed Rulemaking, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 131 FERC ¶ 61,253 (2010), JA___ |
| Non-jurisdictional utilities | Utilities that are not "public utilities" and thus excluded from FERC jurisdiction; *see* 16 U.S.C. § 824(f). |
| Order No. 1000 | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, Final Rule, Docket No. RM10-23-000, FERC Stats. & Regs. ¶ 31,323 (2011), JA____ |
| Order No. 1000-A | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000-A, Order on Rehearing and Clarification, Docket No. RM10-23-001, 139 FERC ¶ 61,132 (2012), JA____ |
| Order No. 1000-B | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000-B, Order on Rehearing and Clarification, Docket No. RM10-23-002, 141 FERC ¶ 61,044 (2012), JA____ |

xlii

| | |
|---|---|
| Orders | Order No. 1000, Order No. 1000-A, and Order No. 1000-B |
| PJM | PJM Interconnection |
| PSEG or PSEG Companies | Public Service Electric and Gas Company, Public Service Enterprise Group Inc., PSEG Power LLC, and PSEG Energy Resources & Trade LLC, Petitioners |
| Public utilities | FERC-jurisdictional utilities, *i.e.*, persons that own or operate facilities subject to FERC jurisdiction under Part II of the Federal Power Act; *see* 16 U.S.C. § 824(e) |
| ROFR | Right of First Refusal |
| RTG | Regional Transmission Group |
| RTO | Regional Transmission Operator |
| Southern | Southern Company Services, Inc., a Petitioner |
| Southern Company Comments | Comments of Southern Company Services, Inc., FERC Docket No. RM10-23-000  (Sept. 29, 2010), JA_____ |
| Southern Company Rehearing | Request for Rehearing of Southern Company Services, Inc., FERC Docket No. RM10-23-000 (Aug. 22, 2011), JA_____ |
| SPP | Southwest Power Pool, Inc. |
| Sunflower Electric Power Corporation & Mid-Kansas Electric Company, LLC Comments | Comments of Sunflower Electric Power Corporation and Mid-Kansas Electric Company, LLC, FERC Docket No. RM10-23-000  (Sept. 29, 2010), JA_____ |

## JURISDICTIONAL STATEMENT

Petitioners seek review of final rulemaking orders issued by the Federal Energy Regulatory Commission ("FERC" or the "Commission") under section 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824e (2010). The orders on review are Order No. 1000, Order No. 1000-A, and Order No. 1000-B (collectively, the "Orders").

All Petitioners timely filed requests for rehearing of Order No. 1000 under FPA section 313(a), 16 U.S.C. § 825*l*(a). After FERC denied rehearing in Order No. 1000-A, Petitioners Alabama Public Service Commission, American Public Power Association, Coalition for Fair Transmission Policy, Edison Electric Institute, International Transmission Company, Large Public Power Council ("LPPC"), National Rural Electric Cooperative Association, New York Independent System Operator, Inc. ("NYISO"), the PSEG Companies, Sacramento Municipal Utility District, South Carolina Public Service Authority, and Southern Company Services, Inc. ("Southern") timely filed petitions for review under FPA section 313(b), 16 U.S.C. § 825*l*(b). Petitioners Midwest ISO Transmission Owners and Oklahoma Gas and Electric Company timely filed requests for rehearing of Order No. 1000-A and, after FERC denied rehearing in Order No. 1000-B, timely filed petitions for review. The Orders are final and this Court has jurisdiction to review them under FPA section 313(b). *Id.*

1

## STATEMENT OF THE CASE

Historically, public utilities have coordinated transmission planning voluntarily, and transmission-development matters like siting, construction, and related planning activities have been subject to state regulation. Order No. 1000 and its sequels require extensive and unprecedented changes to transmission planning, development, and cost allocation that will affect all transmission service providers and their customers. Among other things, the Orders require all public utility transmission providers to: (i) engage in coordinated regional transmission planning, (ii) allocate transmission costs to putative beneficiaries, including those with whom they may have no contractual or service relationship, and (iii) remove from their federal tariffs and contracts provisions that recognize existing utilities' rights to construct and own additions to their transmission systems if such additions are selected in the regional plan for cost allocation.

FERC generically found that these mandates may "promote the more efficient and cost-effective development of new transmission facilities" because, in FERC's view, the historical practice of voluntary transmission planning and cost allocation posed a "theoretical threat" to just and reasonable rates. Order No. 1000 P 52, JA____.

Signatories to this brief raise a number of challenges to the Orders. Several object that the transmission-planning mandate exceeds FERC's statutory authority,

which they argue is limited to encouraging, not requiring, coordinated planning. Various petitioners argue that FERC's Orders are arbitrary and capricious because they are aimed, not at correcting specific abuses or unreasonable existing rates, but at addressing what FERC describes as the "theoretical threat" that existing planning arrangements might not produce a "more efficient and cost-effective" transmission system. Several petitioners object that mandating consideration in planning processes of transmission needs driven by myriad federal, state, and local public-policy requirements violates the FPA by making the needs of load-serving entities (e.g., public utilities) an optional consideration and is arbitrary and capricious. Some petitioners object that the cost-allocation mandate exceeds FERC's statutory authority by allowing and directing allocation of transmission costs to entities having no customer or contractual relationship with the transmission provider.

Several petitioners argue that FERC lacks authority to order public utilities to remove exclusive construction rights from their tariffs and to adopt mechanisms allowing third parties to develop the transmission facilities the utilities need to satisfy their service requirements. These petitioners argue that FERC's actions reduce the efficiencies inherent in vertical integration and arbitrarily interfere with their public-service obligations to maintain reliable service. Some petitioners also challenge the Orders for infringing upon the authority reserved to the States as the

3

States, not FERC, regulate transmission development.  Non-jurisdictional utility customers contest FERC's authority to expand the reciprocal-service condition on their receipt of transmission service to include the Orders' planning and cost-allocation mandates.  An association of jurisdictional utilities objects that FERC's refusal to invoke FPA section 211A to impose the Orders' mandates on non-jurisdictional utilities was arbitrary.  These and several other challenges to the Orders are discussed in the issue-specific briefs.

## STATEMENT REGARDING ADDENDUM

The relevant statutes and regulations are attached as an addendum.

## STATEMENT OF THE FACTS

### I.    Historical Background

### A.    Voluntary Transmission Planning and Limits on FERC's Authority over Transmission Before Order No. 1000

Before 1935, the States alone regulated the provision of electric service.[3] The electric industry was characterized by "vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems" with oversight by state public service commissions.  *New York v. FERC*, 535 U.S. 1, 5 (2002).  Congress enacted Part II of the FPA in that year, granting FERC's

---

[3] The federal government did license hydroelectric facilities.

4

predecessor authority to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1); *see, e.g., Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 4 (D.C. Cir. 2002).

Enactment of Part II of the FPA did not modify the utilities' ability to expand the electric system, subject to the States' regulation of the planning and siting of transmission facilities. Congress specifically rejected a "pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 374 (1973). "[T]hese relationships are governed in the first instance by business judgment and not regulatory coercion." *Id*. While Congress later granted the Commission preemptive authority to regulate siting and construction of natural gas pipelines under section 7 of the Natural Gas Act, 15 U.S.C. § 717f(c), it denied the Commission similar authority over construction and siting of electric transmission facilities. *See* Order No. 1000-A P 139, JA____. "The states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Envtl. Council v. FERC*,

558 F.3d 304, 310 (4th Cir. 2009); *accord, e.g.*, *PacifiCorp*, 72 FERC ¶ 61,087, 61,488 & n.3 (1995).[4]

In accordance with their regulation of transmission construction and siting, some state commissions have authority over transmission planning. *See, e.g.,* Fla. Stat. Ann. § 186.801 (providing for the state commission's regulation of ten-year siting plans); Fla Stat. Ann. § 366.04(5) (providing the state commission jurisdiction over "the planning, development, and maintenance of a coordinated electric power grid" throughout the State); *see also* Conn. Gen. Stat. § 16-50j (providing a state siting council jurisdiction over numerous transmission planning and siting issues).

Consistent with the foregoing, FPA section 202(a) directs FERC to identify regional districts within which utilities would engage in "the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" and "to promote and encourage such interconnection and coordination." 16 U.S.C. § 824a(a). "Congress was convinced that 'enlightened self-interest' would lead utilities to engage voluntarily in power planning arrangements, and it was not willing to mandate that they do so." *Central Iowa*

---

[4] In 2005, Congress granted FERC limited, "backstop" siting authority that is not relevant here. *See* 16 U.S.C. § 824p (2006).

6

*Power Coop. v. FERC,* 606 F.2d 1156, 1168 (D.C. Cir. 1979) (citing S.Rep.No.

621, 74th Cong., 1st Sess. 49; *Otter Tail*, 410 U.S. at 374).

The Commission began to utilize this authority to promote voluntary

coordination in the 1960s when it encouraged the formation of regional reliability

councils and the North American Electric Reliability Council (now a Corporation)

("NERC") tasked with "expand[ing] regional and national coordination among

utilities to further enhance reliability." *New Reporting Requirement Under the*

*Federal Power Act and Changes to Form No. FERC-714*, FERC Stats. & Regs.

¶ 32,493, P 32,688 (1993) (proposed regulations). In 1978, Congress amended the

FPA to require FERC to report on power pooling developments (a form of

coordination),[5] but otherwise did not change FERC's role in promoting voluntary

coordination. 16 U.S.C. § 824a-1(b). Complementing the formation of NERC and

regional reliability councils during the period, a number of large power pooling

agreements were formed or expanded in the 1960s and 1970s. *See, e.g.*, *Central*

*Iowa*, 606 F.2d at 1160 (Mid-Continent Area Power Pool).

Presaging the voluntary regional transmission organizations ("RTOs") it

would later promote, in the early 1990s FERC sought to facilitate voluntary

formation of Regional Transmission Groups ("RTGs"). Transmission-owning

---

[5] Power pooling involves the coordinated planning and operation of
generation and transmission facilities. *Central Iowa,* 606 F.2d at 1162 n.16.

RTG members would agree to transmit power for others, open membership broadly, and engage in "coordinated regional transmission planning and information sharing." *Policy Statement Regarding Regional Transmission Groups*, FERC Stats. & Regs. ¶ 30,976 at 30,869-70 (1993). An entity agreeing to these conditions "would have been entitled to have its decisions receive some degree of deference from the Commission (consistent with the FPA)." *Id*. This approach, FERC stated, was in keeping with the "purely voluntary" nature of RTGs and FERC's "limited authority in the development and success of RTGs." *Id*. at 30,872.

In 1996, FERC issued Order No. 888, requiring public utilities to provide non-discriminatory open access to their transmission networks, based on a *pro forma* open access tariff for the provision of transmission service. The open access requirement was predicated on transmission remaining a natural monopoly: "[I]t is often better," FERC noted, "for a single owner . . . to build a single large transmission line rather than for many transmission owners to build smaller parallel lines . . . ." *See Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities*, 60 Fed. Reg. 17662, 17675 (1995) (Order No. 888 Notice of Proposed Rulemaking). Order No. 888 also "set[s] forth the framework for voluntarily creating Independent System Operators ('ISOs'), independent companies that manage transmission facilities

8

owned by utilities." *Atlantic City*, 295 F.3d at 5.  Several ISOs were formed

including NYISO, PJM Interconnection ("PJM"), ISO New England ("ISO-NE"),

the Midwest Independent Transmission System Operator, Inc. ("MISO") (now,

Midcontinent Independent System Operator), and the California Independent

System Operator Corporation.

Only a few years after Order No. 888, FERC encouraged the voluntary

formation of RTOs in Order No. 2000.[6]     *See Regional Transmission*

*Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, 31,033 (1999),

*order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub*

*nom. Public Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).  In FERC's

view, RTOs would result in "better regional coordination in areas such as

maintenance of transmission and generation systems and transmission planning

and operation." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1364

(D.C. Cir. 2004).  "Order No. 2000 still did not *require* utilities to join RTOs;

participation remained voluntary." *Id*. at 1365 (emphasis in original).  *See Public*

*Util. Dist. No. 1*, 272 F.3d at 609-10 (noting voluntariness); *Atlantic City*, 295 F.3d

---

[6] ISOs were originally designed to provide primarily for the performance of transmission planning and some operations by an entity independent of other market participants, while RTOs represented a further evolutionary step that also provided for that independent entity administering certain power markets.

at 10-12 (same).  PJM, ISO-NE, MISO, and the Southwest Power Pool, Inc. ("SPP") became RTOs.

In 2005, Congress amended the FPA to add section 217, which contains the FPA's only express mention of transmission planning.[7]  This section requires FERC to exercise its authority "in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities…."  16 U.S.C. § 824q(b)(4).

Order No. 890, issued in early 2007, sought to remedy "flaws" FERC perceived in the *pro forma* open access tariffs it had adopted a decade earlier in Order No. 888, including "the lack of specificity" regarding how customers and other stakeholders should be treated in the transmission planning process. *Preventing Undue Discrimination and Preference in Transmission Serv.*, Order No. 890, FERC Stats. & Regs. ¶ 31,241, P 1755, *order on reh'g and clarification*, Order No. 890-A, FERC Stats. & Regs. ¶ 31,261 (2007).  Concerned that a lack of transparency in that process was leading to "inadequate levels of investment in the grid and increasing transmission congestion," FERC ordered several changes to the

---

[7] Congress also added to the FPA section 215, governing the development and enforcement of mandatory reliability standards, and section 211A, allowing FERC to require non-public utility transmission providers to provide transmission services on a comparable and not unduly discriminatory or preferential basis.  16 U.S.C. §§ 824o, 824j-1.

10

*pro forma* tariff.  Order No. 890 P 61.  Among the changes, FERC required public utility "transmission planning meetings [to] be open to all affected parties, including . . . all transmission and interconnection customers, state commissions and other stakeholders."  *Id*. P 460.

### B.    Transmission Planning Conducted by Public Utilities Before Order No. 1000.

The voluntary coordinated planning of transmission facilities is a long-standing practice that has "made significant strides with respect to . . . regional transmission planning processes."  Notice of Proposed Rulemaking, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 131 FERC ¶ 61,253, P 12 (2010) ("NOPR"), JA___.  Both before and in response to Order No. 890, utilities throughout the United States undertook various efforts to coordinate their transmission planning.

RTOs and ISOs nationwide have long coordinated extensive transmission planning (with stakeholder input) with their member transmission owners.  The predecessors of some of these organizations have regional planning histories going back several decades.  *See, e.g.*, *New England Power Co.,* 52 FERC ¶ 61,090, 61,330 n.2 (1990).  In the notice of proposed rulemaking leading to the Orders, FERC praised the "expanded cooperation and collaboration that is now occurring

11

in transmission planning both among transmission providers and between transmission providers and their stakeholders." NOPR P 32.

Areas of the country without RTOs or ISOs (e.g., large portions of the West and the Southeast) are served by vertically integrated utilities that have also engaged in extensive coordination efforts. Transmission planning and expansion throughout the Western Interconnection is coordinated through numerous transmission planning groups, including WestConnect and its Colorado Coordinated Planning Group, ColumbiaGrid, Northern Tier Transmission Group, and the California Transmission Planning Group. *Id*. P 21 n.16. Utilities in the Southeast have also long engaged in coordinated transmission planning though the SERC Reliability Corporation's reliability assessment process and through bilateral reliability agreements.[8]

## II.    The Orders on Review

### A.    Development of the NOPR

In 2009, while Order No. 890 compliance filings were still pending before it, FERC commenced an inquiry into the adequacy of that order's planning processes. *Transmission Planning Processes Under Order No. 890*, Notice of Request for Comments, Docket No. AD09-8-000 (Oct. 8, 2009). FERC sought comments

_____

[8] Southern's Reh'g Requ., Exhibit 1, Suppl. Aff. of Bryan K. Hill, PP 10-16, 29, JA_____; LPPC Comments 13, JA____.

regarding potential remedies to perceived remaining shortcomings in transmission planning and cost allocation post-Order No. 890 to attract needed transmission investment, including whether FERC should consider requiring increased coordination among transmission systems and adoption of new cost allocation methodologies, and whether existing rights of first refusal ("ROFRs") were impeding transmission development.

FERC's NOPR, issued less than a year later, noted a "widely recognized . . . trend of increased investment in the country's transmission infrastructure [that] has emerged in recent years." NOPR P 33 n.41, JA____.  FERC also acknowledged that "regional transmission planning processes" had become "more open, transparent and inclusive" and that non-RTO regions had "also made significant strides with respect to transmission planning by working together to enhance existing, or create new, regional transmission planning processes." *Id.* P 12, JA____.  These efforts, FERC said, were "facilitating the development of more efficient and effective transmission expansion plans." *Id*.

FERC nonetheless concluded that existing planning processes were deficient and that reform of "transmission planning and cost allocation processes [is needed] so that the transmission grid can better support wholesale power markets and thereby ensure that Commission-jurisdictional services are provided at rates, terms and conditions that are just and reasonable and not unduly discriminatory or

13

preferential." *Id.* P 1, JA____.  Relying on  evidence, NOPR PP 33-40, JA____-____, criticized by a number of parties as thin, anecdotal, and conclusory,[9] FERC found that "siting, permitting and cost allocation of transmission facilities face significant challenges," and that without a "requirement for a regional transmission plan . . . the construction of new transmission facilities could be inhibited."  NOPR PP 34-35, JA____-____.

Other NOPR provisions would require that transmission plans consider transmission needs driven by public policy requirements and that owners of transmission facilities designated in the planning process as having met certain criteria would be eligible to allocate costs on a regional basis.  FERC proposed requiring public utilities with existing ROFR provisions in their tariffs and agreements to remove them, *id.* PP 87-89, JA____-____, while allowing "nonincumbent" transmission developers (i.e., entities other than the utilities that own the existing transmission facilities in the region) to build projects in public utilities' state franchised service territories if chosen to do so under the FERC-mandated regional planning process, *id.* P 96, JA___.  FERC also proposed to mandate interregional coordination of transmission planning and development, and adoption of regional and interregional cost allocation methods.  *Id.* PP 114-120, 164-178, JA____-____, ____-____.

---

[9] *E.g.*, LPPC Comments 7-11, JA____.

### B.    The Orders

Order No. 1000 adopted the NOPR's proposals in all material respects. Order Nos. 1000-A and 1000-B, while providing some clarification, denied the rehearing requests.   An overview of Petitioners' challenges to and FERC's justifications of the Orders follows.

### 1.    FERC's Claimed Jurisdiction to Mandate Transmission Planning Requirements

In comments on the NOPR and on rehearing of Order No. 1000, various Petitioners observed that FPA section 202(a) authorizes FERC only to "promote and encourage" the "voluntary interconnection and coordination of facilities for the . . . transmission . . . of electric energy," and they challenged FERC's jurisdiction to compel coordinated regional transmission.   Even assuming such authority, they added that FPA section 206, 16 U.S.C. § 824e, gives FERC only the power to reset "unjust" or "unreasonable" rates for the transmission of electricity.   Section 206 does not, they continued, authorize FERC to mandate coordinated planning that may be more "efficient" or "cost-effective" than the status quo.[10]   Several Petitioners also asserted that the proposed rule would violate FPA section 201(a), 16 U.S.C. § 824(a), by regulating transmission development matters that remain the domain of the States.

---

[10] *E.g.,* FirstEnergy Reh'g Requ. 13-15, JA__.

FERC acknowledged that FPA section 202(a) permitted it to only promote, not to require, "interconnection and coordination of facilities."  Order No. 1000-A P 123, JA____.    But FERC held that the reference to "interconnection and coordination" means that "coordination" under the statute takes place only after "interconnection," i.e., after transmission facilities were built, so that coordination referred only to coordination of "operation of generation and transmission facilities," not the planning of new transmission facilities.  *Id*. P 125, JA____.  Thus, it concluded, the prohibition against mandating coordination applied only to operations, not planning.  *Id*. P 129, JA___.

As to objections that FERC itself had previously described "coordination" as referring to planning as well as operations in its 1970 National Power Survey, FERC said that the parties had offered no proof its prior reference to "coordination" was "intended as an interpretation of the term 'coordination' for purposes of Section 202(a)."  Order No. 1000-A P 146, JA____.   Even if it had been interpreting coordination under section 202(a), FERC added, that section had defined coordination as including "planning *and* operation."   *Id*. (emphasis in original).   Since Order No. 1000 mandated "joint planning alone," FERC said, there was no inconsistency because joint planning, by itself, "is not coordination under this definition."  *Id*.

16

## 2.      Basis for the Orders:  FERC's "Theoretical Threat"

FERC commenced its inquiry that led to the NOPR assuming that there was insufficient investment in transmission and that FERC, presumably, needed to take actions to encourage investment.[11]  Less than one year later, FERC essentially recognized that its assumption of insufficient investment was incorrect, finding a "widely recognized … trend of increased investment in the country's transmission infrastructure [which has] has emerged in recent years."  NOPR P 33 n.41, JA____.  FERC ultimately found that "in the relatively short time since the issuance of Order No. 890, regional "transmission planning processes … have seen substantial improvements" and "in many regions continue to evolve."  Order No. 1000 P 43, JA____.  FERC reiterated its earlier-expressed concern that "inadequate transmission planning and cost allocation requirements may be impeding the development of beneficial transmission lines or resulting in inefficient and overlapping transmission development due to a lack of coordination."  *Id.*

FERC's decision to proceed with a generic national rule drew numerous objections from parties who maintained that FERC's concerns were only conjectural and that Order No. 1000's objectives were already being met through the voluntary initiatives of transmission providers in many regions of the country.

---

[11] Notice of Request for Comments, Docket No. AD09-8-00, p. 6 (2009).   In the ensuing NOPR in Docket No. RM10-23-000, the proceeding now on appeal, FERC refers to the questions raised in that Notice  and associated comments as its own.  NOPR, PP 22-24, JA___-____.

17

The Orders, they noted, were based, not on evidence of specific problems, but on FERC's determination that "inadequate transmission planning and cost allocation requirements may be impeding the development of beneficial transmission lines," and that the Orders "could" or "may" identify transmission solutions that "meet the needs of a transmission planning region more efficiently or cost-effectively."[12]

The parties also maintained that their own experiences disproved FERC's assumptions. LPPC, for example, presented a detailed overview of planning in various regions in which its members do business.[13] A group of southeastern utilities similarly submitted evidence that their region is not characterized by a lack of coordination but that their planning processes are more than effective, to address future challenges. Their evidence described how their coordinated planning had resulted in a robust transmission grid. They referenced the Department of

---

[12] Order No. 1000 P 81, JA____; *see, e.g.*, Order No. 1000 P 6, JA____ (stating that the Orders "*may* resolve the transmission planning region's needs more efficiently and cost-effectively") (emphasis added); *id.* P 47, JA____ (stating that without the Orders, existing practices "*could* result in Commission-jurisdictional services being provided at rates that are unjust and unreasonable") (emphasis added); *id.* P 81, JA____ (stating that without the Orders, "'public utility transmission providers *may* not adequately assess the potential benefits of alternative transmission solutions at the regional level that may meet the needs . . . more efficiently or cost-effectively'") (emphasis added); *id.* P 559, JA____ (stating that without the Orders, "there is a greater *potential* that public utility transmission providers and nonincumbent transmission developers *may* be unable to develop transmission facilities") (emphases added).

[13] LPPC Reh'g Requ. 16 n.36 (citing LPPC Initial NOPR Comments, Attachment, filed September 29, 2010 in FERC Docket No. RM10-23-000), JA____.

Energy's 2009 Transmission Congestion Study that concluded that "[b]ecause southeastern utilities build aggressively in advance of load, there is little economic or reliability congestion within the region,"[14] with the Department of Energy further attributing this success to the effectiveness of the region's transmission planning.[15]  The Midwest ISO Transmission Owners demonstrated that efficient and cost-effective regional transmission development is occurring in RTO regions, including collaborative participation by nonincumbents.[16]  Sunflower Electric Power Corporation and Mid-Kansas Electric Company, LLC (collectively, "Sunflower") took specific exception to the assertion that ROFRs limit the ability of nonincumbents to develop projects, noting SPP's success with new projects and demonstrating how the ROFR facilitates collaboration between nonincumbents seeking to enter the region and smaller, principally rural transmission owners.[17]

This evidence, FERC concluded, did "not mitigate our need to act at this time."  Order No. 1000 P 44, JA____.  Rather, it said, "[t]he increased focus on

---

[14] Ad Hoc Coalition of Southeastern Utilities' Reh'g Requ. 22, JA___ (citing DOE, 2009 National Electric Transmission Congestion Study 60-61 ("Congestion Study")), JA___.

[15] Congestion Study 60 (quoting NERC 2009 Summer Reliability Assessment 131), JA___.

[16] Midwest ISO Transmission Owners' NOPR Comments 34-40, JA____-____; *Id.* Reply Comments 10-14, JA____-____.

[17] Sunflower's Comments 13-19, JA__-__.

19

investment in new transmission projects makes it even more critical to implement these reforms to ensure that the more efficient or cost-effective projects come to fruition." *Id*. P 46, JA____. Citing *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006), FERC added that it did not need actual evidence that existing planning processes were producing unreasonable rates, where, as here, "the problem the Commission seeks to resolve represents a 'theoretical threat,'" stating:

> We conclude that the narrow focus of current planning requirements and shortcomings of current cost allocation practices create an environment that fails to promote the more efficient and cost-effective development of new transmission facilities, and that addressing these issues is necessary to ensure just and reasonable rates. In other words, the problem that the Commission seeks to resolve represents a "theoretical threat," in the words of the *National Fuel* decision . . . .

Order No. 1000 P 52, JA____. According to FERC, the "actual experiences of problems" cited in the Orders, "provide additional support for our action, but are not necessary to justify the remedy." *Id*. P 53, JA____. "A wide range of concerns," FERC explained, "have been raised by commenters, and the Commission need not, and should not, wait for systemic problems to undermine transmission planning before it acts." Order No. 1000 P 50, JA____.

On rehearing, various Petitioners argued that, if a theoretical threat could suffice to justify FERC's rule under *National Fuel*, at the very least FERC faced an extremely high burden if it sought to rely on theory alone. Reliance on theory

20

alone could only conceivably suffice if the rule's subject matter lends itself to resolution without reliance on fact-finding. Citing record evidence, certain Petitioners and Intervenors also argued that FERC's Orders would likely harm, not advance, transmission planning processes.[18] Petitioners further challenged FERC's underlying theory, stating that the Orders would undermine the efficiencies afforded by vertical integration. FERC rejected these arguments, explaining that the "theoretical threat" of potential future inefficiency or cost-ineffectiveness on which it predicated its Orders constituted "legislative facts," and that the description of FERC's hypothesis upon which the Order was based satisfied the APA's substantial evidence requirements. Order No. 1000-A PP 61-75, JA____-____.

### 3.    Cost Allocation

Order No. 1000 requires each public utility transmission provider to have in place a method, or set of methods, for allocating the costs of new transmission facilities selected in regional transmission plans for purposes of cost allocation. Order No. 1000 P 558, JA____. The methodology is required to meet a number of cost allocation principles, including that costs be allocated to entities within a planning region roughly commensurate with the benefits they receive and that no

---

[18] Southern's Reh'g Requ. 30-31, 55, JA___-___, ___ (citing Ex. 1, Suppl. Aff. of Bryan K. Hill PP 15, 17, 18); Sunflower's Reh'g Requ. 2, 10, JA__, ___.

21

entity within a planning region be allocated the costs of new transmission projects from which they derived no benefit.  *Id.* PP 544, 612, JA__, ___.

FERC declined to define "benefits," generally refused to establish limiting parameters on the term, and formalized its determination that transmission developers may and should allocate costs to "beneficiaries" throughout a region whether or not they provide service to those entities.  *Id.* P 537 n.427, JA____.[19] FERC's "jurisdiction is broad enough," it stated in response to objections, "to allow it to ensure that beneficiaries of service provided by specific transmission facilities bear the costs of those benefits regardless of their contractual relationship with the owner of those transmission facilities."  Order No. 1000 P 539, JA____. FERC explained that the source of its authority is "Section 201(b)(1) of the FPA [which] gives the Commission jurisdiction over 'the transmission of electric energy in interstate commerce.'"  *Id.* P 532, JA____ (citation omitted).  FERC asserted that insisting on the existence of a customer/provider relationship through a contract or tariff for service as a prerequisite for cost allocation is "ignoring substance in favor of form."  *Id.* P 537 n.427, JA____.

_____

[19] On rehearing, FERC rejected arguments that FPA section 205 did not permit it to accept rates that charge entities outside a planning region, and with no contractual or customer relationship with the rate filer, for the cost of transmission upgrades, Order No. 1000-A PP 561-567, JA___-___.  Yet FERC adopted a regional cost allocation principle that would not permit allocation to such external entities without their agreement.  Order No. 1000 P 657, JA___.

FERC also rejected other objections to the cost allocation requirement, including that: (i) the requirement is inconsistent with FERC precedent (Order No. 1000-A PP 582-584, JA___-___); (ii) resolving allocation in advance of a section 205 filing by the transmission facility developer is unlawful under the FPA (*id.* P 589, JA__, ___); and (iii) the requirement infringes on state authority (*id.* P 620, JA___).

The Orders also required adoption of a common cost allocation methodology (conforming to similar cost allocation principles) between neighboring regions for interregional transmission projects selected for cost allocation.  Order No. 1000 P 578, JA___.

### 4.     Elimination of Rights of First Refusal and Imposition of Nonincumbent Requirements

The Orders mandate that transmission providers (i) strip from their federal tariffs and agreements provisions recognizing utilities' ROFRs to construct new transmission projects included in regional plans as additions to their existing systems for the purpose of cost allocation; and (ii) give nonincumbents the right to construct, own, and recover the costs of such facilities.  Order No. 1000 PP 253, 323-28, JA___-___.

FERC contended that this was necessary to increase competition and eliminate discrimination among transmission developers.  *See, e.g., id.* P 253,

23

JA___.  Parties raised numerous objections, including that the mandate exceeded FERC's jurisdiction under FPA section 206, *see, e.g., id.* PP 273-75, 280-83, JA___-___, ___-___; impermissibly intruded on States' historical jurisdiction over the siting and construction of transmission facilities, *see id.* PP 276-79, JA___-___; violated, in some instances, the *Mobile-Sierra* doctrine,[20] *see, e.g. id.* P 283, JA___; discriminated against incumbent transmission providers in favor of nonincumbent transmission developers, *see, e.g.*, *id.* P 249, JA___; discriminated against incumbent transmission owners in RTOs in favor of incumbent transmission owners outside RTOs, *see, e.g., id.*; ignored evidence of the benefits of a ROFR approved by FERC only two years before;[21] was inconsistent with FPA section 215, *see id.* P 341, JA___; violated FPA section 217(b)(4), *see id.* PP  91, 460, JA___, ___; was unsupported by and contrary to the evidence, *see, e.g.*, *id.* P 239-245, JA___-___; and would negatively affect reliability, impede planning, and substantially harm consumers, *see, e.g., id.* PP 245-47, JA___-___.

FERC rejected all those arguments and adopted its proposal to require the elimination of ROFRs (with certain limited exceptions) without significant modification.  *Id.* P 313, JA____.  FERC concluded that it had the necessary

---

[20] *Mobile-Sierra* refers to two cases, *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956), and *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

[21] Sunflower's Reh'g Requ. 7, JA____.

authority under FPA section 206, *id.* P 284, JA___, and that its ruling was supported by a "theoretical threat," *id.* P 52, JA___. FERC declined to address in the generic rulemaking proceeding arguments that its mandate violates the *Mobile-Sierra* doctrine. *Id.* P 292, JA____; Order No. 1000-A PP 388-89, JA____-____. On rehearing, FERC expanded its prohibition against ROFRs in tariffs or agreements stating that a ROFR would be impermissible if *any* costs of a transmission facility are allocated outside of an incumbent transmission provider's retail distribution service territory or footprint, including 100 percent allocation to a single local RTO "pricing zone" consisting of more than one utility's transmission system. A federal ROFR for that facility is prohibited, regardless of whether the facility was designed to serve *local* needs or was determined to be a more efficient or cost-effective solution to *regional* needs. Order No. 1000-A P 424, JA____. On further rehearing, FERC rejected arguments that this decision to broaden the scope of facilities for which a ROFR must be eliminated was unsupported by record evidence. Order No. 1000-B P 52, JA____.

### 5. Public Policy Requirements

The Orders mandate that public utility transmission provider planning processes consider transmission needs driven by "Public Policy Requirements" in municipal, state, and federal laws and regulations. *See* Order No. 1000 PP 203-23,

JA___-____; Order No. 1000-A PP 317-39, JA____-____. FERC asserted that this mandate is needed (i) "to remedy opportunities for undue discrimination" and (ii) because without the mandate, "the needs of wholesale customers may not be accurately identified." Order No. 1000 PP 203-04, JA____-____. At the same time, FERC "decline[d] to mandate the consideration of transmission needs driven by any *particular* Public Policy Requirement," including FPA section 217. Order No. 1000 P 215, JA__.

In Order No. 1000 PP 203-224, JA___-___, and Order No. 1000-A PP 168-176, 203-216, JA___-___, ___-___, FERC rejected arguments that: (i) FERC's mandate does not comply with FPA section 217(b)(4)'s directive that FERC exercise its authority to "facilitate[ ] the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy [their] service obligations" because FERC did not require that such transmission needs be considered in the planning process; (ii) the mandate is impermissibly vague and provides insufficient notice of what transmission providers must consider and how they are required to do so; (iii) the mandate is not justified by substantial evidence and represents a departure from FERC's prior practices; and (iv) the mandate will have unintended negative consequences for wholesale markets.

26

### 6.    Infringement Upon State Jurisdiction

Many parties, including state commissions and their membership organization, argued that the Orders' requirements would infringe upon state jurisdiction, particularly as the Orders involve transmission planning and development matters that have historically been left to the business judgment of the affected utilities, subject to state oversight.  Not only was FERC impermissibly using its jurisdiction under section 206 to indirectly regulate transmission planning, siting, construction, and resource planning matters reserved to the States, they argued that FERC was relegating the States to mere stakeholders regarding matters over which the States, not FERC, have primary jurisdiction.

FERC rejected these arguments, stating that the Orders do not interfere with state jurisdiction over transmission construction and siting, and that the Orders were not intended to interfere with state-regulated integrated resource planning. *See* Order No. 1000 PP 107, 156, 175, 213, JA____, ____, ____, ____; Order No. 1000-A PP 186, 192-94, 215, 620, JA____, __-__, ____, ____.


### 7.    Reciprocity for Non-Public Utility Transmission Providers

FERC explained that the reciprocity provisions it first adopted in Order No. 888 also apply to the transmission planning requirements FERC adopted in the Orders.  Order No. 1000-A PP 772-73, JA____-____.  FERC added, however, that

27

if a public utility did demand reciprocity, "those that 'take advantage of open access, including improved transmission planning and cost allocation, should be expected to follow the same requirements as public utility providers.'" *Id*. P 773, JA____ (citation omitted).

FERC rejected arguments by municipal utilities and rural electric cooperatives that applying FERC's long-standing reciprocity rule to require non-public utility transmission providers to satisfy the Order No. 1000 transmission planning and cost allocation mandates was extending the concept of reciprocity beyond its intended purpose of requiring bilateral transmission service.  It further rejected the argument that, because FPA section 211A only gave FERC the affirmative authority to require a non-public utility transmission provider to offer others the same transmission services it provides itself, *a fortiori*, FERC could not indirectly impose a reciprocity condition that went further and required a non-public utility transmission provider to offer its public utility transmission provider transmission service comparable to what the public utility provider offers rather than what the non-public utility provides itself.  Order No. 1000 P 821, JA___.  FERC also rejected the public utility transmission providers' contrasting argument that FERC should use its power under FPA section 211A to require non-public utility transmission providers to comply with FERC's proposed planning mandates and that its failure to do so was arbitrary.  *Id*. P 815, JA___.

28

## STANDARD OF REVIEW

APA section 10(e) directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (C) in excess of statutory jurisdiction."  5 U.S.C. § 706(2).  "To survive this review, FERC 'must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.""'" *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).  An agency's action will be set aside "if the agency has relied on factors which Congress has not intended it to consider', entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Agencies must apply their own precedents consistently or reasonably explain any departures from those precedents.  *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

"In reviewing FERC's assertion of jurisdiction under the FPA and its interpretation of a Commission-approved contract, the court applies the familiar

two-step analysis under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-44 (1984)." *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 544 (D.C. Cir. 2010) (citations omitted). *See also City of Arlington v. FCC*, Nos. 11-1545 & 11-1547, 2013 U.S. LEXIS 3838, *10 (U.S. May 20, 2013). The first step is to determine "whether Congress has directly spoken to the precise question at issue." *Transmission Agency of N. Cal. v. FERC,* 495 F.3d 663, 673 (D.C. Cir. 2007) (quoting *Chevron*, 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 842-43). The analysis ends at *Chevron* Step 1 unless "the statute is silent or ambiguous," *id.*, but an ambiguity exists "only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent," *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 600 (2004); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983-84 (2005). There is no Step 2 analysis, moreover, where prior judicial decisions have determined that an interpretation contrary to the agency's "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable*, 545 U.S. at 982.

Under *Chevron* Step 2, the Court will "defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the

30

agency to make." *National Cable*, 545 U.S. at 986 (internal quotation marks and citations omitted). It will not defer when the agency's decision "was not based on [its] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [an outcome is] desirable or required." *PSEG Energy*, 665 F.3d at 209 (citations omitted).

The APA and FPA each require that FERC's finding be supported by "substantial evidence." 5 U.S.C. § 706(2) ; 16 U.S.C. § 825*l*(b). "Substantiality of evidence must take into account whatever in the record fairly detracts from its weight," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951), such that an agency must "explain why it rejected evidence that is contrary to its findings," *Carpenters & Millwrights v. NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007). Further, "an administrative agency must respond to comments which, if true, . . . would require a change in an agency's proposed rule." *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1169 (D.C. Cir. 1996) (internal citations omitted).

## **STANDING**

The Petitioners and their supporting Intervenors include public utilities, non-public utilities that are generally not subject to FERC jurisdiction (e.g., municipal and cooperative utilities), business associations of public and non-public utilities, and state regulatory commissions. The Orders on review inflicted a number of

"concrete and particularized" injuries on the Petitioners and their supporting Intervenors. *E.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These injuries include, among other things, imposing mandatory planning requirements that govern their daily business affairs,[22] increasing their allocation of transmission costs, abrogating rights created by FERC-approved contracts and recognized in FERC-jurisdictional tariffs, and, in the case of the state commissions, usurping their jurisdiction. The Orders on review are the direct cause of these injuries and this Court can provide redress by setting the Orders aside. The Petitioners and their supporting Intervenors have standing. *See, e.g.*, *id.* at 560-61. Where, as here, standing is beyond dispute for some petitioners, a court need not address each petitioner's standing individually. *Military Toxics Project v EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998).

---

[22] Order No. 1000 became effective on October 11, 2011. *See* Order No. 1000 P 836, JA___. Public utilities were required to submit their initial compliance filings in October 2012. *See id.* P 792, JA____.

32

Respectfully submitted,

/s/ *Harvey L. Reiter*
Harvey L. Reiter
Email: hreiter@stinson.com
Jonathan D. Schneider
Email: jschneider@stinson.com
Jonathan Peter Trotta
Email: jtrotta@stinson.com
STINSON MORRISON HECKLER LLP
1775 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006
Telephone: (202) 785-9100

*Counsel for Petitioners/Intervenors*
*South Carolina Public Service*
*Authority, the Large Public Power*
*Council, and Sacramento Municipal*
*Utility District*

/s/ *Andrew W. Tunnell*
Andrew W. Tunnell
Email: atunnell@balch.com
Ed R. Haden
Email: ehaden@balch.com
Scott B. Grover
Email: sgrover@balch.com
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 251-8100

*Counsel for Petitioner/Intervenor*
*Southern Company Services, Inc.*

/s/ *George Scott Morris*
George Scott Morris
Email: scott.morris@psc.alabama.gov
Luther Daniel Bentley, IV
Email: luke.bentley@psc.alabama.gov
ALABAMA PUBLIC SERVICE COMMISSION
Suite 836
100 North Union Street
Montgomery, AL 36104
Telephone: (334) 242-5200

*Counsel for Petitioner/Intervenor*
*Alabama Public Service Commission*

/s/ *Randolph Lee Elliott*
Randolph Lee Elliott
Email: relliott@mbolaw.com
MILLER, BALIS & O'NEIL, PC
1015 15th Street, NW
12th Floor
Washington, DC 20005-2605
Telephone: (202) 296-2960

*Counsel   for   Petitioners/Intervenors*
*American Public Power Association and*
*National Rural Electric Cooperative*
*Association*

33

/s/ *Sue Deliane Sheridan*
Sue Deliane Sheridan
Email: suedsheridan@yahoo.com
SHERIDAN ENERGY & ENVIRONMENTAL
  CONSULTING, LLC
1050 Thomas Jefferson Street, NW
Suite 700
Washington, DC 20007
Telephone: (202) 298-3718

*Counsel for Petitioner/Intervenor*
*Coalition for Fair Transmission Policy*


/s/ *Wendy N. Reed*
Wendy N. Reed
Email: reed@wrightlaw.com
Matthew J. Binette
Email: binette@wrightlaw.com
David S. Berman
Email: berman@wrightlaw.com
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3802
Telephone: (202) 393-1200

*Counsel for Petitioner/Intervenor*
*Midwest ISO Transmission Owners*

/s/ *Elias G. Farrah*
Elias G. Farrah
Email: EFarrah@winston.com
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Telephone: (202) 282-5503

*Counsel for Intervenor*
*New York Transmission Owners*

/s/ *Stephen Matthew Spina*
Stephen Matthew Spina
Email: sspina@morganlewis.com
John D. McGrane
Email: jmcgrane@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Telephone: (202) 739-3000

Edward Comer, Vice President, General
Counsel and Corporate Secretary
Email: ecomer@eei.org
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 508-5000

*Counsel for Petitioner/Intervenor*
*Edison Electric Institute*


/s/ *Howard Haswell Shafferman*
Howard Haswell Shafferman
Email: hhs@ballardspahr.com
Jack Nadim Semrani
Email: semranij@ballardspahr.com
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006-1157
Telephone: (202) 661-2200

*Counsel for Petitioner New York*
*Independent System Operator, Inc.*

34

/s/ *John L. Shepherd, Jr.*
John L. Shepherd, Jr.
Email: John.Shepherd@skadden.com
William Rainey Barksdale
Email:
William.Barksdale@skadden.com
Karis Anne Gong
Email: Karis.Gong@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7000

Tamara L. Linde
Email: Tamara.Linde@PSEG.com
Jodi L. Moskowitz
Email: Jodi.Moskowitz@PSEG.com
PSEG SERVICES CORPORATION
80 Park Plaza, T5G
Newark, NJ 07102-4194
Telephone: (973) 430-6409

*Counsel for Petitioners/Intervenors*
*PSEG Energy Resources & Trade LLC,*
*PSEG Power LLC, Public Service*
*Electric and Gas Company, Public*
*Service Enterprise Group Inc.*

/s/ *Kenneth G. Jaffe*
Kenneth G. Jaffe
Email: kenneth.jaffe@alston.com
Michael E. Ward
Email: michael.ward@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004-1404
Telephone: (202) 756-3300

Randall Bruce Palmer, Esquire, Senior
Counsel
Email: rpalmer@firstenergycorp.com
ALLEGHENY ENERGY, INC.
800 Cabin Hill Drive
Greensburg, PA 15601-0000
Telephone: (724) 838-6894

*Counsel for Petitioners/Intervenors*
*American Transmission Systems*
*Incorporated, Cleveland Electric*
*Illuminating Company, FirstEnergy*
*Solutions Corp., Jersey Central Power*
*& Light Company, Metropolitan Edison*
*Company, Monongahela Power*
*Company, Ohio Edison Company,*
*Pennsylvania Electric Company,*
*Pennsylvania Power Company, The*
*Potomac Edison Company, Toledo*
*Edison Company, Trans-Allegheny*
*Interstate Line Company, and West*
*Penn Power Company*

/s/ *Kenneth B. Driver*
Kenneth B. Driver
Email: kbdriver@jonesday.com
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-7629

*Counsel for Petitioner Oklahoma Gas and Electric Company*


/s/ *Gary E. Guy*
Gary E. Guy
Email: gary.e.guy@bge.com
BALTIMORE GAS AND ELECTRIC
COMPANY
2 Center Plaza, 13th Floor
110 West Fayette Street
Baltimore, MD 21201-0000
Telephone: (410) 470-1337

Jeanne Jackson Dworetzky, Assistant
General Counsel
Email:
jeanne.dworetzky@exeloncorp.com
EXELON CORPORATION
101 Constitution Avenue, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 347-7500

*Counsel for Intervenor Exelon Corporation*


/s/ *Clare E. Kindall*
Clare E. Kindall
Department Head – Energy
Email: Clare.Kindall@ct.gov
OFFICE OF THE ATTORNEY GENERAL
Ten Franklin Square
New Britain, CT 06051
Telephone:  (860) 827-2683

*Counsel for Intervenor Connecticut Public Utilities Regulatory Authority*


/s/ *Cynthia B. Miller*
Cynthia B. Miller
Associate General Counsel
Email: cmiller@psc.state.fl.us
FLORIDA PUBLIC SERVICE COMMISSION
2540 Shumard Oak Boulevard
Tallahassee, FL 32399-0862
Telephone: (850) 413-6082

*Counsel for Intervenor Florida Public Service Commission*


/s/ *Matthew J. Binette*
Barry S. Spector
Email: spector@wrightlaw.com
Matthew J. Binette
Email: binette@wrightlaw.com
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3802
Telephone: (202) 393-1200

*Counsel for Intervenor Southwest Power Pool, Inc.*

/s/ *Daniel M. Malabonga*
Daniel M. Malabonga
Email: dmmalabonga@venable.com
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 344-4508

Stephen G. Kozey
Vice-President, Secretary, and General
Counsel
Email: stevekozey@misoenergy.org
Mathew R. Dorsett
Attorney
Email: mdorsett@misonergy.org
MIDCONTINENT INDEPENDENT SYSTEM
OPERATOR, INC.
P.O. Box 4202
Carmel, IN 46082-46032
Telephone: (317) 249-5431

*Counsel for Intervenor Midcontinent
Independent System Operator, Inc.*


/s/ *N. Beth Emery*
N. Beth Emery
Email:
Beth.Emery@HuschBlackwell.com
HUSCH BLACKWELL LLP
755 E. Mulberry Street, Suite 200
San Antonio, TX 78212
Telephone: (210) 244-8802

*Counsel for Intervenors Sunflower
Electric Power Corporation and Mid-
Kansas Electric Company, LLC*

/s/ *Daniel E. Frank*
Daniel E. Frank
Email: daniel.frank@sutherland.com
Jennifer J.K. Herbert
Email: jj.herbert@sutherland.com
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, N.W., Suite 700
Washington, DC 20001-3980
Telephone: (202) 383-0100

*Counsel for Western Farmers Electric
Cooperative*


/s/ *James Bradford Ramsay*
James Bradford Ramsay
General Counsel
Email: jramsay@naruc.org
Holly Rachel Smith
Assistant General Counsel
Email: hsmith@naruc.org
NATIONAL ASSOCIATION OF
 REGULATORY UTILITY
 COMMISSIONERS*
 *(intervention pending)
1101 Vermont Ave., NW, Suite 200
Washington, DC 20005
Telephone: (202) 898-1350

*Counsel for Intervenor National
Association of Regulatory Utility
Commissioners*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7) and D.C. Cir. R. 32(a)(2), I hereby certify that the textual portion of the foregoing brief (exclusive of tables of contents and authorities, glossary, certificates of service and length, but including footnotes) contains _____6,831_____ words as determined by the word-counting feature of Microsoft Word.

Respectfully submitted,

*/s/ Andrew W. Tunnell*
Andrew W. Tunnell
*Counsel for Petitioner/Intervenor Southern Company Services, Inc.*

*And on behalf of Petitioners and Intervenors South Carolina Public Service Authority, the Large Public Power Council, and Sacramento Municipal Utility District; Alabama Public Service Commission; American Public Power Association; Coalition for Fair Transmission Policy; Edison Electric Institute;  Exelon Corporation; American Transmission Systems Incorporated, Cleveland Electric Illuminating Company, FirstEnergy Solutions Corp., Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Ohio Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, The Potomac Edison Company, Toledo Edison Company, Trans-Allegheny Interstate Line Company, and West Penn Power Company; Midwest ISO*

*Transmission Owners; National Rural Electric Cooperative Association; New York Independent System Operator, Inc.; New York Transmission Owners, Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Power Authority, New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation d/b/a National Grid, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation; Oklahoma Gas and Electric Company; PSEG Energy Resources & Trade LLC, PSEG Power LLC, Public Service Electric and Gas Company, Public Service Enterprise Group Inc.; Connecticut Public Utilities Regulatory Authority; Florida Public Service Commission; Midcontinent Independent System Operator, Inc.; Southwest Power Pool, Inc.; Sunflower Electric Power Corporation and Mid-Kansas Electric Company, LLC; Western Farmers Electric Cooperative;  National Association of Regulatory Utility  Commissioners (intervention pending)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, pursuant to D.C. Cir. R. 25(c), service of the foregoing will be made electronically by the CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated this 28th day of May, 2013.

*/s/ Andrew W. Tunnell*
Of Counsel

# Addendum
# of Pertinent Statutes
# and Regulations

*South Carolina Public Service Authority, et al. v.*
*Federal Energy Regulatory Commission*
**Case Nos. 12-1232, 12-1233, 12-1250, 12-1276, 12-1279, 12-1280,**
**12-1285, 12-1292, 12-1293, 12-1296, 12-1299, 12-1300, 12-1304, 12-1448,**
**and 12-1478 (Consolidated)**

## TABLE OF CONTENTS

5 U.S.C. § 706 ................................................................................................A001

15 U.S.C. § 717f ............................................................................................A003

16 U.S.C. § 824 (FPA § 201) ........................................................................A006

16 U.S.C. § 824a (FPA § 202) ......................................................................A008

16 U.S.C. § 824a-1 ........................................................................................A011

16 U.S.C. § 824d (FPA § 205) ......................................................................A012

16 U.S.C. § 824e (FPA § 206) ......................................................................A014

16 U.S.C. § 824j-1 (FPA § 211A) ................................................................A017

16 U.S.C. § 824o (FPA § 215) ......................................................................A019

16 U.S.C. § 824p (FPA § 216) ......................................................................A023

16 U.S.C. § 824q (FPA § 217) ......................................................................A027

16 U.S.C. § 825*l* (FPA § 313) ......................................................................A029

18 C.F.R. § 39.2 ............................................................................................A031

18 C.F.R. § 39.10 ..........................................................................................A033

CMEP 6.1 ......................................................................................................A034

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

   (1) compel agency action unlawfully withheld or unreasonably delayed; and

   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

     (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

     (B) contrary to constitutional right, power, privilege, or immunity;

A001

USCA Case #12-1232    Document #1438221         Filed: 05/28/2013    Page 93 of 125

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e). 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

### § 717f. Construction, extension, or abandonment of facilities

#### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

#### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

A003

USCA Case #12-1232     Document #1438221          Filed: 05/28/2013     Page 95 of 125

**(c) Certificate of public convenience and necessity**

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the prac-

USCA Case #12-1232    Document #1438221    Filed: 05/28/2013    Page 96 of 125

tice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, §7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, §608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, §2, Oct. 6, 1988, 102 Stat. 2302.)

### AMENDMENTS

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, §608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, §608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

### EFFECTIVE DATE OF 1988 AMENDMENT

Section 3 of Pub. L. 100–474 provided that: "The provisions of this Act [amending this section and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988]."

### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

A005

## § 824. Declaration of policy; application of subchapter

### (a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

### (b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

### (c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

### (d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

### (e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e),[1] 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

### (f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

### (g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, §201, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 847; amended Pub. L. 95–617, title II, §204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, §714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985.)

### REFERENCES IN TEXT

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, as amended, which is classified generally to chapter 31 (§901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

### AMENDMENTS

2005—Subsec. (b)(2). Pub. L. 109–58, §1295(a)(1), substituted "Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824l, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title" for "The provisions of sections 824i, 824j, and 824k of this title" and "Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824l, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "Compliance with any order of the Commission under the provisions of section 824i or 824j of this title".

Subsec. (e). Pub. L. 109–58, §1295(a)(2), substituted "section 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "section 824i, 824j, or 824k of this title".

Subsec. (f). Pub. L. 109–58, §1291(c), which directed amendment of subsec. (f) by substituting "political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year," for "political subdivision of a state,", was executed by making the substitution for "political subdivision of a State," to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, §1277(b)(1), substituted "2005" for "1935".

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, §204(b)(1), designated existing provisions as par. (1), inserted "except as provided in paragraph (2)" after "in interstate commerce, but", and added par. (2).

Subsec. (e). Pub. L. 95–617, §204(b)(2), inserted "(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)" after "under this subchapter".

### EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

### STATE AUTHORITIES; CONSTRUCTION

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

### PRIOR ACTIONS; EFFECT ON OTHER AUTHORITIES

Section 214 of Pub. L. 95–617 provided that:

"(a) PRIOR ACTIONS.—No provision of this title [enacting sections 823a, 824l to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

"(b) OTHER AUTHORITIES.—No provision of this title [enacting sections 823a, 824l to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title."

## § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

### (a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and

between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

**(b) Sale or exchange of energy; establishing physical connections**

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

**(c) Temporary connection and exchange of facilities during emergency**

During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

**(d) Temporary connection during emergency by persons without jurisdiction of Commission**

During the continuance of any emergency requiring immediate action, any person engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary facilities for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: *Provided*, That such temporary connection shall be discontinued or such temporary construction removed or otherwise disposed of upon the termination of such emergency: *Provided further*, That upon approval of the Commission permanent connections for emergency use only may be made hereunder.

**(e) Transmission of electric energy to foreign country**

After six months from August 26, 1935, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

**(f) Transmission or sale at wholesale of electric energy; regulation**

The ownership or operation of facilities for the transmission or sale at wholesale of electric energy which is (a) generated within a State and transmitted from the State across an international boundary and not thereafter transmitted into any other State, or (b) generated in a foreign country and transmitted across an international boundary into a State and not thereafter transmitted into any other State, shall not make a person a public utility subject to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e) of this section.

**(g) Continuance of service**

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to—

(1) report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

(2) submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting—

A009

USCA Case #12-1232     Document #1438221          Filed: 05/28/2013      Page 101 of 125

(A) shortages of electric energy or capacity, and

(B) circumstances which may result in such shortages, and

(3) accommodate any such shortages or circumstances in a manner which shall—

(A) give due consideration to the public health, safety, and welfare, and

(B) provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.

(June 10, 1920, ch. 285, pt. II, §202, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 846; amended Aug. 7, 1953, ch. 343, 67 Stat. 461; Pub. L. 95–617, title II, §206(a), Nov. 9, 1978, 92 Stat. 3141.)

### AMENDMENTS

1978—Subsec. (g). Pub. L. 95–617 added subsec. (g).

1953—Subsec. (f). Act Aug. 7, 1953, added subsec. (f).

### EFFECTIVE DATE OF 1978 AMENDMENT

Section 206(b) of Pub. L. 95–617 provided that: "The amendment made by subsection (a) [adding subsec. (g) of this section] shall not affect any proceeding of the Commission [Federal Energy Regulatory Commission] pending on the date of the enactment of this Act [Nov. 9, 1978] or any case pending on such date respecting a proceeding of the Commission."

### DELEGATION OF FUNCTIONS

Functions of President respecting certain facilities constructed and maintained on United States borders delegated to Secretary of State, see Ex. Ord. No. 11423, Aug. 16, 1968, 33 F.R. 11741, set out as a note under section 301 of Title 3, The President.

### PERFORMANCE OF FUNCTIONS RESPECTING ELECTRIC POWER AND NATURAL GAS FACILITIES LOCATED ON UNITED STATES BORDERS

For provisions relating to performance of functions by Secretary of Energy respecting electric power and natural gas facilities located on United States borders, see Ex. Ord. No. 10485, Sept. 8, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, set out as a note under section 717b of Title 15, Commerce and Trade.

USCA Case #12-1232     Document #1438221          Filed: 05/28/2013     Page 102 of 125

**(b) Pooling study**

(1) The Commission, in consultation with the reliability councils established under section 202(a) of the Federal Power Act [16 U.S.C. 824a], the Secretary, and the electric utility industry shall study the opportunities for—

(A) conservation of energy,

(B) optimization in the efficiency of use of facilities and resources, and

(C) increased reliability,

through pooling arrangements. Not later than 18 months after November 9, 1978, the Commission shall submit a report containing the results of such study to the President and the Congress.

(2) The Commission may recommend to electric utilities that such utilities should voluntarily enter into negotiations where the opportunities referred to in paragraph (1) exist. The Commission shall report annually to the President and the Congress regarding any such recommendations and subsequent actions taken by electric utilities, by the Commission, and by the Secretary under this Act, the Federal Power Act [16 U.S.C. 791a et seq.], and any other provision of law. Such annual reports shall be included in the Commission's annual report required under the Department of Energy Organization Act [42 U.S.C. 7101 et seq.].

(Pub. L. 95–617, title II, § 205, Nov. 9, 1978, 92 Stat. 3140.)

REFERENCES IN TEXT

This Act, referred to in subsec. (b)(2), means Pub. L. 95–617, Nov. 9, 1978, 92 Stat. 3117, known as the "Public Utility Regulatory Policies Act of 1978". For complete classification of this Act to the Code, see Short Title note set out under section 2601 of this title and Tables.

The Federal Power Act, referred to in subsec. (b)(2), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to this chapter. For complete classification of this Act to the Code, see section 791a of this title and Tables.

The Department of Energy Organization Act, referred to in subsec. (b)(2), is Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, which is classified principally to chapter 84 (§ 7101 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of Title 42 and Tables.

CODIFICATION

Section was enacted as part of the Public Utility Regulatory Policies Act of 1978, and not as part of the Federal Power Act which generally comprises this chapter.

DEFINITIONS

For definitions of terms used in this section, see section 2602 of this title.

## § 824a–1. Pooling

**(a) State laws**

The Commission may, on its own motion, and shall, on application of any person or governmental entity, after public notice and notice to the Governor of the affected State and after affording an opportunity for public hearing, exempt electric utilities, in whole or in part, from any provision of State law, or from any State rule or regulation, which prohibits or prevents the voluntary coordination of electric utilities, including any agreement for central dispatch, if the Commission determines that such voluntary coordination is designed to obtain economical utilization of facilities and resources in any area. No such exemption may be granted if the Commission finds that such provision of State law, or rule or regulation—

(1) is required by any authority of Federal law, or

(2) is designed to protect public health, safety, or welfare, or the environment or conserve energy or is designed to mitigate the effects of emergencies resulting from fuel shortages.



### § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

#### (a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

#### (b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

#### (c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

#### (d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

#### (e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and de-

livering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

#### (f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

USCA Case #12-1232     Document #1438221     Filed: 05/28/2013     Page 104 of 125

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142.)

### Amendments

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

### Study of Electric Rate Increases Under Federal Power Act

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies

**§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission**

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate,

USCA Case #12-1232    Document #1438221        Filed: 05/28/2013      Page 106 of 125

of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided,* That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by

the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision".

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

EFFECTIVE DATE OF 1988 AMENDMENT

Section 4 of Pub. L. 100–473 provided that: "The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however,* That such complaints may be withdrawn and refiled without prejudice."

[1] See References in Text note below.

LIMITATION ON AUTHORITY PROVIDED

Section 3 of Pub. L. 100–473 provided that: "Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.]."

STUDY

Section 5 of Pub. L. 100–473 directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

## § 824j–1. Open access by unregulated transmitting utilities

**(a) Definition of unregulated transmitting utility**

In this section, the term "unregulated transmitting utility" means an entity that—

(1) owns or operates facilities used for the transmission of electric energy in interstate commerce; and

(2) is an entity described in section 824(f) of this title.

**(b) Transmission operation services**

Subject to section 824k(h) of this title, the Commission may, by rule or order, require an unregulated transmitting utility to provide transmission services—

(1) at rates that are comparable to those that the unregulated transmitting utility charges itself; and

(2) on terms and conditions (not relating to rates) that are comparable to those under which the unregulated transmitting utility provides transmission services to itself and that are not unduly discriminatory or preferential.

**(c) Exemption**

The Commission shall exempt from any rule or order under this section any unregulated transmitting utility that—

(1) sells not more than 4,000,000 megawatt hours of electricity per year;

(2) does not own or operate any transmission facilities that are necessary for operating an interconnected transmission system (or any portion of the system); or

(3) meets other criteria the Commission determines to be in the public interest.

**(d) Local distribution facilities**

The requirements of subsection (b) of this section shall not apply to facilities used in local distribution.

**(e) Exemption termination**

If the Commission, after an evidentiary hearing held on a complaint and after giving consideration to reliability standards established under section 824o of this title, finds on the basis of a preponderance of the evidence that any exemption granted pursuant to subsection (c) of this section unreasonably impairs the continued reliability of an interconnected transmission system, the Commission shall revoke the exemption granted to the transmitting utility.

**(f) Application to unregulated transmitting utilities**

The rate changing procedures applicable to public utilities under subsections (c) and (d) of section 824d of this title are applicable to unregulated transmitting utilities for purposes of this section.

**(g) Remand**

In exercising authority under subsection (b)(1) of this section, the Commission may remand transmission rates to an unregulated transmitting utility for review and revision if necessary to meet the requirements of subsection (b) of this section.

**(h) Other requests**

The provision of transmission services under subsection (b) of this section does not preclude

a request for transmission services under section 824j of this title.

**(i) Limitation**

The Commission may not require a State or municipality to take action under this section that would violate a private activity bond rule for purposes of section 141 of title 26.

**(j) Transfer of control of transmitting facilities**

Nothing in this section authorizes the Commission to require an unregulated transmitting utilty to transfer control or operational control of its transmitting facilities to a Transmission Organization that is designated to provide non-discriminatory transmission access.

(June 10, 1920, ch. 285, pt. II, § 211A, as added Pub. L. 109–58, title XII, § 1231, Aug. 8, 2005, 119 Stat. 955.)

USCA Case #12-1232     Document #1438221          Filed: 05/28/2013     Page 110 of 125

§ 824o. Electric reliability

(a) Definitions

For purposes of this section:

(1) The term "bulk-power system" means—

(A) facilities and control systems necessary for operating an interconnected electric energy transmission network (or any portion thereof); and

(B) electric energy from generation facilities needed to maintain transmission system reliability.

The term does not include facilities used in the local distribution of electric energy.

---

[1] See References in Text note below.

(2) The terms "Electric Reliability Organization" and "ERO" mean the organization certified by the Commission under subsection (c) of this section the purpose of which is to establish and enforce reliability standards for the bulk-power system, subject to Commission review.

(3) The term "reliability standard" means a requirement, approved by the Commission under this section, to provide for reliable operation of the bulk-power system. The term includes requirements for the operation of existing bulk-power system facilities, including cybersecurity protection, and the design of planned additions or modifications to such facilities to the extent necessary to provide for reliable operation of the bulk-power system, but the term does not include any requirement to enlarge such facilities or to construct new transmission capacity or generation capacity.

(4) The term "reliable operation" means operating the elements of the bulk-power system within equipment and electric system thermal, voltage, and stability limits so that instability, uncontrolled separation, or cascading failures of such system will not occur as a result of a sudden disturbance, including a cybersecurity incident, or unanticipated failure of system elements.

(5) The term "Interconnection" means a geographic area in which the operation of bulk-power system components is synchronized such that the failure of one or more of such components may adversely affect the ability of the operators of other components within the system to maintain reliable operation of the facilities within their control.

(6) The term "transmission organization" means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities.

(7) The term "regional entity" means an entity having enforcement authority pursuant to subsection (e)(4) of this section.

(8) The term "cybersecurity incident" means a malicious act or suspicious event that disrupts, or was an attempt to disrupt, the operation of those programmable electronic devices and communication networks including hardware, software and data that are essential to the reliable operation of the bulk power system.

**(b) Jurisdiction and applicability**

(1) The Commission shall have jurisdiction, within the United States, over the ERO certified by the Commission under subsection (c) of this section, any regional entities, and all users, owners and operators of the bulk-power system, including but not limited to the entities described in section 824(f) of this title, for purposes of approving reliability standards established under this section and enforcing compliance with this section. All users, owners and operators of the bulk-power system shall comply with reliability standards that take effect under this section.

(2) The Commission shall issue a final rule to implement the requirements of this section not later than 180 days after August 8, 2005.

**(c) Certification**

Following the issuance of a Commission rule under subsection (b)(2) of this section, any person may submit an application to the Commission for certification as the Electric Reliability Organization. The Commission may certify one such ERO if the Commission determines that such ERO—

(1) has the ability to develop and enforce, subject to subsection (e)(2) of this section, reliability standards that provide for an adequate level of reliability of the bulk-power system; and

(2) has established rules that—

(A) assure its independence of the users and owners and operators of the bulk-power system, while assuring fair stakeholder representation in the selection of its directors and balanced decisionmaking in any ERO committee or subordinate organizational structure;

(B) allocate equitably reasonable dues, fees, and other charges among end users for all activities under this section;

(C) provide fair and impartial procedures for enforcement of reliability standards through the imposition of penalties in accordance with subsection (e) of this section (including limitations on activities, functions, or operations, or other appropriate sanctions);

(D) provide for reasonable notice and opportunity for public comment, due process, openness, and balance of interests in developing reliability standards and otherwise exercising its duties; and

(E) provide for taking, after certification, appropriate steps to gain recognition in Canada and Mexico.

**(d) Reliability standards**

(1) The Electric Reliability Organization shall file each reliability standard or modification to a reliability standard that it proposes to be made effective under this section with the Commission.

(2) The Commission may approve, by rule or order, a proposed reliability standard or modification to a reliability standard if it determines that the standard is just, reasonable, not unduly discriminatory or preferential, and in the public interest. The Commission shall give due weight to the technical expertise of the Electric Reliability Organization with respect to the content of a proposed standard or modification to a reliability standard and to the technical expertise of a regional entity organized on an Interconnection-wide basis with respect to a reliability standard to be applicable within that Interconnection, but shall not defer with respect to the effect of a standard on competition. A proposed standard or modification shall take effect upon approval by the Commission.

(3) The Electric Reliability Organization shall rebuttably presume that a proposal from a regional entity organized on an Interconnection-wide basis for a reliability standard or modification to a reliability standard to be applicable on an Interconnection-wide basis is just, reasonable, and not unduly discriminatory or preferential, and in the public interest.

USCA Case #12-1232    Document #1438221    Filed: 05/28/2013    Page 112 of 125

(4) The Commission shall remand to the Electric Reliability Organization for further consideration a proposed reliability standard or a modification to a reliability standard that the Commission disapproves in whole or in part.

(5) The Commission, upon its own motion or upon complaint, may order the Electric Reliability Organization to submit to the Commission a proposed reliability standard or a modification to a reliability standard that addresses a specific matter if the Commission considers such a new or modified reliability standard appropriate to carry out this section.

(6) The final rule adopted under subsection (b)(2) of this section shall include fair processes for the identification and timely resolution of any conflict between a reliability standard and any function, rule, order, tariff, rate schedule, or agreement accepted, approved, or ordered by the Commission applicable to a transmission organization. Such transmission organization shall continue to comply with such function, rule, order, tariff, rate schedule or agreement accepted, approved, or ordered by the Commission until—

    (A) the Commission finds a conflict exists between a reliability standard and any such provision;

    (B) the Commission orders a change to such provision pursuant to section 824e of this title; and

    (C) the ordered change becomes effective under this subchapter.

If the Commission determines that a reliability standard needs to be changed as a result of such a conflict, it shall order the ERO to develop and file with the Commission a modified reliability standard under paragraph (4) or (5) of this subsection.

**(e) Enforcement**

(1) The ERO may impose, subject to paragraph (2), a penalty on a user or owner or operator of the bulk-power system for a violation of a reliability standard approved by the Commission under subsection (d) of this section if the ERO, after notice and an opportunity for a hearing—

    (A) finds that the user or owner or operator has violated a reliability standard approved by the Commission under subsection (d) of this section; and

    (B) files notice and the record of the proceeding with the Commission.

(2) A penalty imposed under paragraph (1) may take effect not earlier than the 31st day after the ERO files with the Commission notice of the penalty and the record of proceedings. Such penalty shall be subject to review by the Commission, on its own motion or upon application by the user, owner or operator that is the subject of the penalty filed within 30 days after the date such notice is filed with the Commission. Application to the Commission for review, or the initiation of review by the Commission on its own motion, shall not operate as a stay of such penalty unless the Commission otherwise orders upon its own motion or upon application by the user, owner or operator that is the subject of such penalty. In any proceeding to review a penalty imposed under paragraph (1), the Commission, after notice and opportunity for hearing (which hearing may consist solely of the record before the ERO and opportunity for the presentation of supporting reasons to affirm, modify, or set aside the penalty), shall by order affirm, set aside, reinstate, or modify the penalty, and, if appropriate, remand to the ERO for further proceedings. The Commission shall implement expedited procedures for such hearings.

(3) On its own motion or upon complaint, the Commission may order compliance with a reliability standard and may impose a penalty against a user or owner or operator of the bulk-power system if the Commission finds, after notice and opportunity for a hearing, that the user or owner or operator of the bulk-power system has engaged or is about to engage in any acts or practices that constitute or will constitute a violation of a reliability standard.

(4) The Commission shall issue regulations authorizing the ERO to enter into an agreement to delegate authority to a regional entity for the purpose of proposing reliability standards to the ERO and enforcing reliability standards under paragraph (1) if—

    (A) the regional entity is governed by—

        (i) an independent board;

        (ii) a balanced stakeholder board; or

        (iii) a combination independent and balanced stakeholder board.

    (B) the regional entity otherwise satisfies the provisions of subsection (c)(1) and (2) of this section; and

    (C) the agreement promotes effective and efficient administration of bulk-power system reliability.

The Commission may modify such delegation. The ERO and the Commission shall rebuttably presume that a proposal for delegation to a regional entity organized on an Interconnection-wide basis promotes effective and efficient administration of bulk-power system reliability and should be approved. Such regulation may provide that the Commission may assign the ERO's authority to enforce reliability standards under paragraph (1) directly to a regional entity consistent with the requirements of this paragraph.

(5) The Commission may take such action as is necessary or appropriate against the ERO or a regional entity to ensure compliance with a reliability standard or any Commission order affecting the ERO or a regional entity.

(6) Any penalty imposed under this section shall bear a reasonable relation to the seriousness of the violation and shall take into consideration the efforts of such user, owner, or operator to remedy the violation in a timely manner.

**(f) Changes in Electric Reliability Organization rules**

The Electric Reliability Organization shall file with the Commission for approval any proposed rule or proposed rule change, accompanied by an explanation of its basis and purpose. The Commission, upon its own motion or complaint, may propose a change to the rules of the ERO. A proposed rule or proposed rule change shall take effect upon a finding by the Commission, after notice and opportunity for comment, that

the change is just, reasonable, not unduly discriminatory or preferential, is in the public interest, and satisfies the requirements of subsection (c) of this section.

**(g) Reliability reports**

The ERO shall conduct periodic assessments of the reliability and adequacy of the bulk-power system in North America.

**(h) Coordination with Canada and Mexico**

The President is urged to negotiate international agreements with the governments of Canada and Mexico to provide for effective compliance with reliability standards and the effectiveness of the ERO in the United States and Canada or Mexico.

**(i) Savings provisions**

(1) The ERO shall have authority to develop and enforce compliance with reliability standards for only the bulk-power system.

(2) This section does not authorize the ERO or the Commission to order the construction of additional generation or transmission capacity or to set and enforce compliance with standards for adequacy or safety of electric facilities or services.

(3) Nothing in this section shall be construed to preempt any authority of any State to take action to ensure the safety, adequacy, and reliability of electric service within that State, as long as such action is not inconsistent with any reliability standard, except that the State of New York may establish rules that result in greater reliability within that State, as long as such action does not result in lesser reliability outside the State than that provided by the reliability standards.

(4) Within 90 days of the application of the Electric Reliability Organization or other affected party, and after notice and opportunity for comment, the Commission shall issue a final order determining whether a State action is inconsistent with a reliability standard, taking into consideration any recommendation of the ERO.

(5) The Commission, after consultation with the ERO and the State taking action, may stay the effectiveness of any State action, pending the Commission's issuance of a final order.

**(j) Regional advisory bodies**

The Commission shall establish a regional advisory body on the petition of at least two-thirds of the States within a region that have more than one-half of their electric load served within the region. A regional advisory body shall be composed of one member from each participating State in the region, appointed by the Governor of each State, and may include representatives of agencies, States, and provinces outside the United States. A regional advisory body may provide advice to the Electric Reliability Organization, a regional entity, or the Commission regarding the governance of an existing or proposed regional entity within the same region, whether a standard proposed to apply within the region is just, reasonable, not unduly discriminatory or preferential, and in the public interest, whether fees proposed to be assessed within the region are just, reasonable,

not unduly discriminatory or preferential, and in the public interest and any other responsibilities requested by the Commission. The Commission may give deference to the advice of any such regional advisory body if that body is organized on an Interconnection-wide basis.

**(k) Alaska and Hawaii**

The provisions of this section do not apply to Alaska or Hawaii.

(June 10, 1920, ch. 285, pt. II, § 215, as added Pub. L. 109–58, title XII, § 1211(a), Aug. 8, 2005, 119 Stat. 941.)

STATUS OF ERO

Pub. L. 109–58, title XII, § 1211(b), Aug. 8, 2005, 119 Stat. 946, provided that: "The Electric Reliability Organization certified by the Federal Energy Regulatory Commission under section 215(c) of the Federal Power Act [16 U.S.C. 824o(c)] and any regional entity delegated enforcement authority pursuant to section 215(e)(4) of that Act [16 U.S.C. 824o(e)(4)] are not departments, agencies, or instrumentalities of the United States Government."

ACCESS APPROVALS BY FEDERAL AGENCIES

Pub. L. 109–58, title XII, § 1211(c), Aug. 8, 2005, 119 Stat. 946, provided that: "Federal agencies responsible for approving access to electric transmission or distribution facilities located on lands within the United States shall, in accordance with applicable law, expedite any Federal agency approvals that are necessary to allow the owners or operators of such facilities to comply with any reliability standard, approved by the [Federal Energy Regulatory] Commission under section 215 of the Federal Power Act [16 U.S.C. 824o], that pertains to vegetation management, electric service restoration, or resolution of situations that imminently endanger the reliability or safety of the facilities."

USCA Case #12-1232      Document #1438221          Filed: 05/28/2013      Page 114 of 125

§ 824p. Siting of interstate electric transmission facilities

(a) Designation of national interest electric transmission corridors

(1) Not later than 1 year after August 8, 2005, and every 3 years thereafter, the Secretary of Energy (referred to in this section as the "Secretary"), in consultation with affected States, shall conduct a study of electric transmission congestion.

(2) After considering alternatives and recommendations from interested parties (including an opportunity for comment from affected States), the Secretary shall issue a report, based on the study, which may designate any geographic area experiencing electric energy transmission capacity constraints or congestion that adversely affects consumers as a national interest electric transmission corridor.

(3) The Secretary shall conduct the study and issue the report in consultation with any appropriate regional entity referred to in section 824o of this title.

(4) In determining whether to designate a national interest electric transmission corridor under paragraph (2), the Secretary may consider whether—

(A) the economic vitality and development of the corridor, or the end markets served by the corridor, may be constrained by lack of adequate or reasonably priced electricity;

(B)(i) economic growth in the corridor, or the end markets served by the corridor, may

be jeopardized by reliance on limited sources of energy; and

(ii) a diversification of supply is warranted;

(C) the energy independence of the United States would be served by the designation;

(D) the designation would be in the interest of national energy policy; and

(E) the designation would enhance national defense and homeland security.

**(b) Construction permit**

Except as provided in subsection (i) of this section, the Commission may, after notice and an opportunity for hearing, issue one or more permits for the construction or modification of electric transmission facilities in a national interest electric transmission corridor designated by the Secretary under subsection (a) of this section if the Commission finds that—

(1)(A) a State in which the transmission facilities are to be constructed or modified does not have authority to—

(i) approve the siting of the facilities; or

(ii) consider the interstate benefits expected to be achieved by the proposed construction or modification of transmission facilities in the State;

(B) the applicant for a permit is a transmitting utility under this chapter but does not qualify to apply for a permit or siting approval for the proposed project in a State because the applicant does not serve end-use customers in the State; or

(C) a State commission or other entity that has authority to approve the siting of the facilities has—

(i) withheld approval for more than 1 year after the filing of an application seeking approval pursuant to applicable law or 1 year after the designation of the relevant national interest electric transmission corridor, whichever is later; or

(ii) conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission congestion in interstate commerce or is not economically feasible;

(2) the facilities to be authorized by the permit will be used for the transmission of electric energy in interstate commerce;

(3) the proposed construction or modification is consistent with the public interest;

(4) the proposed construction or modification will significantly reduce transmission congestion in interstate commerce and protects or benefits consumers;

(5) the proposed construction or modification is consistent with sound national energy policy and will enhance energy independence; and

(6) the proposed modification will maximize, to the extent reasonable and economical, the transmission capabilities of existing towers or structures.

**(c) Permit applications**

(1) Permit applications under subsection (b) of this section shall be made in writing to the Commission.

(2) The Commission shall issue rules specifying—

(A) the form of the application;

(B) the information to be contained in the application; and

(C) the manner of service of notice of the permit application on interested persons.

**(d) Comments**

In any proceeding before the Commission under subsection (b) of this section, the Commission shall afford each State in which a transmission facility covered by the permit is or will be located, each affected Federal agency and Indian tribe, private property owners, and other interested persons, a reasonable opportunity to present their views and recommendations with respect to the need for and impact of a facility covered by the permit.

**(e) Rights-of-way**

(1) In the case of a permit under subsection (b) of this section for electric transmission facilities to be located on property other than property owned by the United States or a State, if the permit holder cannot acquire by contract, or is unable to agree with the owner of the property to the compensation to be paid for, the necessary right-of-way to construct or modify the transmission facilities, the permit holder may acquire the right-of-way by the exercise of the right of eminent domain in the district court of the United States for the district in which the property concerned is located, or in the appropriate court of the State in which the property is located.

(2) Any right-of-way acquired under paragraph (1) shall be used exclusively for the construction or modification of electric transmission facilities within a reasonable period of time after the acquisition.

(3) The practice and procedure in any action or proceeding under this subsection in the district court of the United States shall conform as nearly as practicable to the practice and procedure in a similar action or proceeding in the courts of the State in which the property is located.

(4) Nothing in this subsection shall be construed to authorize the use of eminent domain to acquire a right-of-way for any purpose other than the construction, modification, operation, or maintenance of electric transmission facilities and related facilities. The right-of-way cannot be used for any other purpose, and the right-of-way shall terminate upon the termination of the use for which the right-of-way was acquired.

**(f) Compensation**

(1) Any right-of-way acquired pursuant to subsection (e) of this section shall be considered a taking of private property for which just compensation is due.

(2) Just compensation shall be an amount equal to the fair market value (including applicable severance damages) of the property taken on the date of the exercise of eminent domain authority.

**(g) State law**

Nothing in this subsection precludes any person from constructing or modifying any transmission facility in accordance with State law.

**(h) Coordination of Federal authorizations for transmission facilities**

(1) In this subsection:

(A) The term "Federal authorization" means any authorization required under Federal law in order to site a transmission facility.

(B) The term "Federal authorization" includes such permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law in order to site a transmission facility.

(2) The Department of Energy shall act as the lead agency for purposes of coordinating all applicable Federal authorizations and related environmental reviews of the facility.

(3) To the maximum extent practicable under applicable Federal law, the Secretary shall coordinate the Federal authorization and review process under this subsection with any Indian tribes, multistate entities, and State agencies that are responsible for conducting any separate permitting and environmental reviews of the facility, to ensure timely and efficient review and permit decisions.

(4)(A) As head of the lead agency, the Secretary, in consultation with agencies responsible for Federal authorizations and, as appropriate, with Indian tribes, multistate entities, and State agencies that are willing to coordinate their own separate permitting and environmental reviews with the Federal authorization and environmental reviews, shall establish prompt and binding intermediate milestones and ultimate deadlines for the review of, and Federal authorization decisions relating to, the proposed facility.

(B) The Secretary shall ensure that, once an application has been submitted with such data as the Secretary considers necessary, all permit decisions and related environmental reviews under all applicable Federal laws shall be completed—

(i) within 1 year; or

(ii) if a requirement of another provision of Federal law does not permit compliance with clause (i), as soon thereafter as is practicable.

(C) The Secretary shall provide an expeditious pre-application mechanism for prospective applicants to confer with the agencies involved to have each such agency determine and communicate to the prospective applicant not later than 60 days after the prospective applicant submits a request for such information concerning—

(i) the likelihood of approval for a potential facility; and

(ii) key issues of concern to the agencies and public.

(5)(A) As lead agency head, the Secretary, in consultation with the affected agencies, shall prepare a single environmental review document, which shall be used as the basis for all decisions on the proposed project under Federal law.

(B) The Secretary and the heads of other agencies shall streamline the review and permitting of transmission within corridors designated under section 503 of the Federal Land Policy and Management Act[1] (43 U.S.C. 1763) by fully taking into account prior analyses and decisions relating to the corridors.

(C) The document shall include consideration by the relevant agencies of any applicable criteria or other matters as required under applicable law.

(6)(A) If any agency has denied a Federal authorization required for a transmission facility, or has failed to act by the deadline established by the Secretary pursuant to this section for deciding whether to issue the authorization, the applicant or any State in which the facility would be located may file an appeal with the President, who shall, in consultation with the affected agency, review the denial or failure to take action on the pending application.

(B) Based on the overall record and in consultation with the affected agency, the President may—

(i) issue the necessary authorization with any appropriate conditions; or

(ii) deny the application.

(C) The President shall issue a decision not later than 90 days after the date of the filing of the appeal.

(D) In making a decision under this paragraph, the President shall comply with applicable requirements of Federal law, including any requirements of—

(i) the National Forest Management Act of 1976 (16 U.S.C. 472a et seq.);

(ii) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(iii) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.);

(iv) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(v) the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).

(7)(A) Not later than 18 months after August 8, 2005, the Secretary shall issue any regulations necessary to implement this subsection.

(B)(i) Not later than 1 year after August 8, 2005, the Secretary and the heads of all Federal agencies with authority to issue Federal authorizations shall enter into a memorandum of understanding to ensure the timely and coordinated review and permitting of electricity transmission facilities.

(ii) Interested Indian tribes, multistate entities, and State agencies may enter the memorandum of understanding.

(C) The head of each Federal agency with authority to issue a Federal authorization shall designate a senior official responsible for, and dedicate sufficient other staff and resources to ensure, full implementation of the regulations and memorandum required under this paragraph.

(8)(A) Each Federal land use authorization for an electricity transmission facility shall be issued—

(i) for a duration, as determined by the Secretary, commensurate with the anticipated use of the facility; and

(ii) with appropriate authority to manage the right-of-way for reliability and environmental protection.

(B) On the expiration of the authorization (including an authorization issued before August 8,

---

[1] So in original. Probably should be followed by "of 1976".

USCA Case #12-1232    Document #1438221    Filed: 05/28/2013    Page 117 of 125

2005), the authorization shall be reviewed for renewal taking fully into account reliance on such electricity infrastructure, recognizing the importance of the authorization for public health, safety, and economic welfare and as a legitimate use of Federal land.

(9) In exercising the responsibilities under this section, the Secretary shall consult regularly with—

(A) the Federal Energy Regulatory Commission;

(B) electric reliability organizations (including related regional entities) approved by the Commission; and

(C) Transmission Organizations approved by the Commission.

**(i) Interstate compacts**

(1) The consent of Congress is given for three or more contiguous States to enter into an interstate compact, subject to approval by Congress, establishing regional transmission siting agencies to—

(A) facilitate siting of future electric energy transmission facilities within those States; and

(B) carry out the electric energy transmission siting responsibilities of those States.

(2) The Secretary may provide technical assistance to regional transmission siting agencies established under this subsection.

(3) The regional transmission siting agencies shall have the authority to review, certify, and permit siting of transmission facilities, including facilities in national interest electric transmission corridors (other than facilities on property owned by the United States).

(4) The Commission shall have no authority to issue a permit for the construction or modification of an electric transmission facility within a State that is a party to a compact, unless the members of the compact are in disagreement and the Secretary makes, after notice and an opportunity for a hearing, the finding described in subsection (b)(1)(C) of this section.

**(j) Relationship to other laws**

(1) Except as specifically provided, nothing in this section affects any requirement of an environmental law of the United States, including the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(2) Subsection (h)(6) of this section shall not apply to any unit of the National Park System, the National Wildlife Refuge System, the National Wild and Scenic Rivers System, the National Trails System, the National Wilderness Preservation System, or a National Monument.

**(k) ERCOT**

This section shall not apply within the area referred to in section 824k(k)(2)(A) of this title.

(June 10, 1920, ch. 285, pt. II, §216, as added Pub. L. 109–58, title XII, §1221(a), Aug. 8, 2005, 119 Stat. 946.)

### References in Text

The National Forest Management Act of 1976, referred to in subsec. (h)(6)(D)(i), is Pub. L. 94–588, Oct. 22, 1976, 90 Stat. 2949, as amended, which enacted sections 472a, 521b, 1600, and 1611 to 1614 of this title, amended sections 500, 515, 516, 518, 576b, and 1601 to 1610 of this title, repealed sections 476, 513, and 514 of this title, and enacted provisions set out as notes under sections 476, 513, 528, 594–2, and 1600 of this title. For complete classification of this Act to the Code, see Short Title of 1976 Amendment note set out under section 1600 of this title and Tables.

The Endangered Species Act of 1973, referred to in subsec. (h)(6)(D)(ii), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, as amended, which is classified principally to chapter 35 (§1531 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (h)(6)(D)(iii), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The National Environmental Policy Act of 1969, referred to in subsecs. (h)(6)(D)(iv) and (j), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Federal Land Policy and Management Act of 1976, referred to in subsec. (h)(6)(D)(v), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, which is classified principally to chapter 35 (§1701 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 43 and Tables.

A026



### § 824q. Native load service obligation

#### (a) Definitions

In this section:

(1) The term "distribution utility" means an electric utility that has a service obligation to end-users or to a State utility or electric cooperative that, directly or indirectly, through one or more additional State utilities or electric cooperatives, provides electric service to end-users.

(2) The term "load-serving entity" means a distribution utility or an electric utility that has a service obligation.

(3) The term "service obligation" means a requirement applicable to, or the exercise of authority granted to, an electric utility under Federal, State, or local law or under long-term contracts to provide electric service to end-users or to a distribution utility.

(4) The term "State utility" means a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or a corporation that is wholly owned, directly or indirectly, by any one or more of the foregoing, competent to carry on the business of developing, transmitting, utilizing, or distributing power.

#### (b) Meeting service obligations

(1) Paragraph (2) applies to any load-serving entity that, as of August 8, 2005—

(A) owns generation facilities, markets the output of Federal generation facilities, or holds rights under one or more wholesale contracts to purchase electric energy, for the purpose of meeting a service obligation; and

(B) by reason of ownership of transmission facilities, or one or more contracts or service agreements for firm transmission service,

A027

holds firm transmission rights for delivery of the output of the generation facilities or the purchased energy to meet the service obligation.

(2) Any load-serving entity described in paragraph (1) is entitled to use the firm transmission rights, or, equivalent tradable or financial transmission rights, in order to deliver the output or purchased energy, or the output of other generating facilities or purchased energy to the extent deliverable using the rights, to the extent required to meet the service obligation of the load-serving entity.

(3)(A) To the extent that all or a portion of the service obligation covered by the firm transmission rights or equivalent tradable or financial transmission rights is transferred to another load-serving entity, the successor load-serving entity shall be entitled to use the firm transmission rights or equivalent tradable or financial transmission rights associated with the transferred service obligation.

(B) Subsequent transfers to another load-serving entity, or back to the original load-serving entity, shall be entitled to the same rights.

(4) The Commission shall exercise the authority of the Commission under this chapter in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities, and enables load-serving entities to secure firm transmission rights (or equivalent tradable or financial rights) on a long-term basis for long-term power supply arrangements made, or planned, to meet such needs.

**(c) Allocation of transmission rights**

Nothing in subsections (b)(1), (b)(2), and (b)(3) of this section shall affect any existing or future methodology employed by a Transmission Organization for allocating or auctioning transmission rights if such Transmission Organization was authorized by the Commission to allocate or auction financial transmission rights on its system as of January 1, 2005, and the Commission determines that any future allocation or auction is just, reasonable and not unduly discriminatory or preferential, provided, however, that if such a Transmission Organization never allocated financial transmission rights on its system that pertained to a period before January 1, 2005, with respect to any application by such Transmission Organization that would change its methodology the Commission shall exercise its authority in a manner consistent with the[1] chapter and that takes into account the policies expressed in subsections (b)(1), (b)(2), and (b)(3) of this section as applied to firm transmission rights held by a load-serving entity as of January 1, 2005, to the extent the associated generation ownership or power purchase arrangements remain in effect.

**(d) Certain transmission rights**

The Commission may exercise authority under this chapter to make transmission rights not used to meet an obligation covered by subsection (b) of this section available to other en-

tities in a manner determined by the Commission to be just, reasonable, and not unduly discriminatory or preferential.

**(e) Obligation to build**

Nothing in this chapter relieves a load-serving entity from any obligation under State or local law to build transmission or distribution facilities adequate to meet the service obligations of the load-serving entity.

**(f) Contracts**

Nothing in this section shall provide a basis for abrogating any contract or service agreement for firm transmission service or rights in effect as of August 8, 2005. If an ISO in the Western Interconnection had allocated financial transmission rights prior to August 8, 2005, but had not done so with respect to one or more load-serving entities' firm transmission rights held under contracts to which the preceding sentence applies (or held by reason of ownership or future ownership of transmission facilities), such load-serving entities may not be required, without their consent, to convert such firm transmission rights to tradable or financial rights, except where the load-serving entity has voluntarily joined the ISO as a participating transmission owner (or its successor) in accordance with the ISO tariff.

**(g) Water pumping facilities**

The Commission shall ensure that any entity described in section 824(f) of this title that owns transmission facilities used predominately to support its own water pumping facilities shall have, with respect to the facilities, protections for transmission service comparable to those provided to load-serving entities pursuant to this section.

**(h) ERCOT**

This section shall not apply within the area referred to in section 824k(k)(2)(A) of this title.

**(i) Jurisdiction**

This section does not authorize the Commission to take any action not otherwise within the jurisdiction of the Commission.

**(j) TVA area**

(1) Subject to paragraphs (2) and (3), for purposes of subsection (b)(1)(B) of this section, a load-serving entity that is located within the service area of the Tennessee Valley Authority and that has a firm wholesale power supply contract with the Tennessee Valley Authority shall be considered to hold firm transmission rights for the transmission of the power provided.

(2) Nothing in this subsection affects the requirements of section 824k(j) of this title.

(3) The Commission shall not issue an order on the basis of this subsection that is contrary to the purposes of section 824k(j) of this title.

**(k) Effect of exercising rights**

An entity that to the extent required to meet its service obligations exercises rights described in subsection (b) of this section shall not be considered by such action as engaging in undue discrimination or preference under this chapter.

(June 10, 1920, ch. 285, pt. II, § 217, as added Pub. L. 109–58, title XII, § 1233(a), Aug. 8, 2005, 119 Stat. 957.)

---

[1] So in original. Probably should be "this".

A028

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the

hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

**§ 39.2  Jurisdiction and applicability.**

(a) Within the United States (other than Alaska and Hawaii), the Electric Reliability Organization, any Regional Entities, and all users, owners and operators of the Bulk-Power System, including but not limited to entities described in section 201(f) of the Federal Power Act, shall be subject to the jurisdiction of the Commission for the purposes of approving Reliability Standards established under section 215 of the Federal Power Act and enforcing compliance with section 215 of the Federal Power Act.

(b) All entities subject to the Commission's reliability jurisdiction under

A031

**Federal Energy Regulatory Commission**

paragraph (a) of this section shall comply with applicable Reliability Standards, the Commission's regulations, and applicable Electric Reliability Organization and Regional Entity Rules made effective under this part.

(c) Each user, owner and operator of the Bulk-Power System within the United States (other than Alaska and Hawaii) shall register with the Electric Reliability Organization and the Regional Entity for each region within which it uses, owns or operates Bulk-Power System facilities, in such manner as prescribed in the Rules of the Electric Reliability Organization and each applicable Regional Entity.

(d) Each user, owner or operator of the Bulk-Power System within the United States (other than Alaska and Hawaii) shall provide the Commission, the Electric Reliability Organization and the applicable Regional Entity such information as is necessary to implement section 215 of the Federal Power Act as determined by the Commission and set out in the Rules of the Electric Reliability Organization and each applicable Regional Entity. The Electric Reliability Organization and each Regional Entity shall provide the Commission such information as is necessary to implement section 215 of the Federal Power Act.

A032

**Federal Energy Regulatory Commission**                    **§ 39.12**

change, together with a description of the proceedings conducted by the Electric Reliability Organization or Regional Entity to develop the proposal.

(b) The Commission, upon its own motion or upon complaint, may propose a change to an Electric Reliability Organization Rule or Regional Entity Rule.

(c) A proposed Electric Reliability Organization Rule or Rule change or Regional Entity Rule or Rule change shall take effect upon a finding by the Commission, after notice and opportunity for public comment, that the change is just, reasonable, not unduly discriminatory or preferential, is in the public interest, and satisfies the requirements of § 39.3.

**§ 39.10  Changes to an Electric Reliability Organization Rule or Regional Entity Rule.**

(a) The Electric Reliability Organization shall file with the Commission for approval any proposed Electric Reliability Organization Rule or Rule change. A Regional Entity shall submit a Regional Entity Rule or Rule change to the Electric Reliability Organization and, if approved by the Electric Reliability Organization, the Electric Reliability Organization shall file the proposed Regional Entity Rule or Rule change with the Commission for approval. Any filing by the Electric Reliability Organization shall be accompanied by an explanation of the basis and purpose for the Rule or Rule

339

A033

## 6.1 Requirement for Submission of Mitigation Plans

A Registered Entity found to be in violation of a Reliability Standard shall file with the Compliance Enforcement Authority (i) a proposed Mitigation Plan to correct the violation, or (ii) a description of how the violation has been mitigated, and any requests for extensions of Mitigation Plans or a report of completed mitigation. A Registered Entity may also submit a proposed Mitigation Plan at any other time, including with a Self-Report, or, without admitting it has committed a violation, in response to a Notice of Possible Violation or notification of Alleged Violation.